# Illinois Official Reports

## Appellate Court

---

| | |
|---|---|
| | **People v. Taliani, 2020 IL App (3d) 170546** |

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. STEVEN A. TALIANI, Defendant-Appellant. |
| District & No. | Third District<br>No. 3-17-0546 |
| Filed | March 18, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Bureau County, No. 94-CF-37; the Hon. Michael C. Jansz, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Thomas A. Lilien, and Lucas Walker, of State Appellate Defender's Office, of Elgin, for appellant.<br><br>Gino Caffarini, State's Attorney, of Princeton (Patrick Delfino, Thomas D. Arado, and Gary F. Gnidovec, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE CARTER delivered the judgment of the court, with opinion.<br>Presiding Justice Lytton concurred in the judgment and opinion.<br>Justice McDade dissented, with opinion. |

¶ 1 Defendant, Steven A. Taliani, appeals the denial of his motion for leave to file a second successive postconviction petition. Defendant argues that he set forth a colorable claim of actual innocence based on the affirmative defense of involuntary intoxication. We affirm.

¶ 2                                                    I. BACKGROUND

¶ 3 Defendant was charged with first degree murder (720 ILCS 5/9-1(a)(2) (West 1992)) for causing the death of Francee Wolf and aggravated battery with a firearm (*id.* § 12-4.2(a)(1)) for shooting Clementina Frasco, Wolf's mother, with a shotgun.

¶ 4 The matter proceeded to a jury trial. In defendant's direct appeal, we summarized the State's evidence, in part, as follows:

"The record discloses that the 32-year-old defendant had been dating 22-year-old Francee Wolf for about a year before their relationship began to break up in the summer of 1994. Around the beginning of that year, defendant began dating another woman, and he accused Wolf of seeing a married man. They decided to seek counseling. On June 27, defendant met with Dr. Richard Brady, a psychiatrist, who prescribed medication for clinical depression and told him to return in 30 days. On July 8 and 9, defendant and Wolf argued. On the evening of July 12, Wolf drove to defendant's home in Spring Valley, Illinois. According to defendant, they discussed their relationship and then had sex. Afterward, defendant produced a sawed-off shotgun and fired it, hitting the wall and window and possibly the back of Wolf's head.

Meanwhile, Frasco became concerned when she came home and found that Wolf had left. She drove to defendant's, arriving just before Wolf, clad only in a pair of silk sleep shorts, ran out of the house screaming, 'Psycho.' Defendant, wielding the gun and wearing only boxer shorts, pursued. Wolf climbed into Frasco's car and doubled over with her head toward the floor as Frasco attempted to drive away. Defendant ran up to the car and fired once through the driver's side window, hitting Frasco in the face. He then circled back to the passenger side and fired his last shot into Wolf's back, killing her." *People v. Taliani*, No. 3-94-0921 (1995) (unpublished order under Illinois Supreme Court Rule 23).

¶ 5 Defendant set forth an insanity defense. Dr. Robert Chapman, a forensic psychiatrist, testified that he administered a personality test to defendant and interviewed defendant approximately two months after the incident. Chapman diagnosed defendant with major affective disorder, or depression with suicide ideation, and obsessive compulsive disorder. Chapman opined that defendant's depression severely impaired his ability to appreciate the criminality of his conduct. Chapman stated that defendant believed that he and Wolf would be together after death. Chapman explained: "[T]hat is a common distorted belief that severely depressed people have and that is why we sometimes see people in severe depression who will, prior to killing themselves, will kill their children and their spouse and their families." Chapman stated that such individuals believed that they were taking their family and loved ones out of a painful world to a place where they would be together and happy. Chapman testified that defendant believed this. Defendant also believed that Wolf agreed with his homicide/suicide ideas. Defendant said that he shared his homicide/suicide thoughts with

Wolf. Wolf said, " 'No matter what, I'll always be with you.' " Defendant interpreted this to mean that Wolf would always be with him after death.

¶ 6    Dr. Richard Brady testified that defendant visited him on June 27, 1994. Brady diagnosed defendant with major depression. Defendant did not tell Brady that he had dreams and feelings of the desire to kill himself and Wolf. Defendant reported having suicidal thoughts two weekends before his appointment, but he was not experiencing those thoughts at the time of the appointment. Defendant denied having the intent to harm himself or others and said he did not think he could harm himself or others. Brady found that defendant had no disorder as to his form of thought.

¶ 7    The jury found defendant guilty of both charges. The court sentenced defendant to consecutive terms of 70 years' imprisonment for first degree murder and 30 years' imprisonment for aggravated battery with a firearm.

¶ 8    On direct appeal, we affirmed defendant's conviction and sentence. *Taliani*, No. 3-94-0921.

¶ 9    In 1996, defendant filed a *pro se* postconviction petition raising several claims of ineffective assistance of counsel. The circuit court summarily dismissed the petition, and we affirmed. *People v. Taliani*, No. 3-96-0672 (1997) (unpublished order under Illinois Supreme Court Rule 23).

¶ 10   In 2000, defendant filed a *pro se* petition for relief from judgment pursuant to section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2000)). The circuit court denied the petition, and we affirmed the judgment of the circuit court. *People v. Taliani*, No. 3-00-0913 (2003) (unpublished order under Illinois Supreme Court Rule 23).

¶ 11   In 2002, defendant filed another *pro se* petition for relief from judgment pursuant to section 2-1401, which was later recharacterized as a successive postconviction petition. Counsel was appointed to assist defendant with his petition. In 2014, defendant filed an amended successive postconviction petition through counsel, which raised several claims. The State filed a motion to dismiss the amended successive postconviction petition. The circuit court granted the motion to dismiss, finding that defendant had not shown cause and prejudice. We affirmed the judgment of the circuit court. *People v. Taliani*, 2016 IL App (3d) 150478-U.

¶ 12   On May 18, 2017, defendant filed a motion for leave to file a second successive postconviction petition, which is the subject of the instant appeal. Defendant sought to raise a claim of actual innocence based on the affirmative defense of involuntary intoxication from the unwarned side effects of prescription medications that he was taking at the time of the offense. Defendant alleged that such a defense was not available until the supreme court issued its decision in *People v. Hari*, 218 Ill. 2d 275 (2006), which was decided more than 10 years after defendant's trial.

¶ 13   Specifically, the motion alleged that, at the time of the offense, defendant was taking two prescription medications, Buspar and Desyrel. The motion stated that Brady, the prescribing doctor, failed to tell defendant that these medications could cause serotonin syndrome if taken together. The motion further alleged:

> "At the time of the offense, [defendant] was suffering from symptoms associated with serotonin syndrome, including[:] heightened irritability, confusion, and altered consciousness, as well as, increased suicidal ideations, also a side effect of serotonergic medications such as Buspar."

The motion alleged that defendant continued to take Buspar and Desyrel while he was in jail awaiting trial. Chapman examined defendant while defendant was preparing his insanity defense. Chapman stated in his report that defendant appeared to be quite confused and had difficulty concentrating and making decisions. Chapman concluded that defendant was not able to appreciate the criminality of his conduct or conform his conduct to the requirements of the law.

¶ 14 Defendant attached a medical report prepared by Brady to his motion for leave. The report indicated that Brady had diagnosed defendant with major depression and prescribed Buspar and Desyrel.

¶ 15 Defendant also attached a report from a counseling center recommending that defendant be considered a suicide risk while he was incarcerated in the county jail after the incident.

¶ 16 Defendant attached an article stating that Buspar and Desyrel could cause serotonin syndrome if taken at the same time. The article stated: "Symptoms of the serotonin syndrome may include mental status changes such as irritability, altered consciousness, confusion, hallucination, and coma ***."

¶ 17 Defendant also attached an article about Buspar and its side effects from the Bristol-Myers Squibb Company. The article said that Buspar was used for the management of anxiety disorders and that some individuals taking Buspar had experienced suicidal ideation. Suicidal ideation was classified as an infrequent adverse event, meaning that it occurred in between 1 in 100 to 1 in 1000 patients. Defendant attached several photocopied pages of the 1993 edition of the Physicians' Desk Reference. The copied pages discussed Desyrel and Buspar.

¶ 18 Defendant also attached Chapman's report. The report stated that the results of the Minnesota Multiphasic Personality Inventory-2 showed that defendant appeared to be confused and disorganized and that he had difficulty concentrating and making decisions. The results also showed that defendant reported bizarre and unusual sensory experiences and confused thinking. Chapman diagnosed defendant with major affective disorder, or depression with suicide ideation, and obsessive compulsive disorder. It was Chapman's opinion that, at the time of the offense, defendant was suffering from a severe homicidal and suicidal depression that substantially impaired his ability to appreciate the criminality of his conduct or conform his conduct to the requirements of the law.

¶ 19 The circuit court denied defendant's motion for leave to file a second successive postconviction petition.

¶ 20 II. ANALYSIS

¶ 21 Defendant argues that the circuit court erred in denying him leave to file his second successive postconviction petition because he presented a colorable claim of actual innocence based on the affirmative defense of involuntary intoxication. Specifically, defendant argues that, at the time of the offense, he was experiencing symptoms of serotonin syndrome, including increased irritability, confusion, and altered consciousness. Defendant claims that these were side effects from the combination of Buspar and Desyrel, two medications prescribed to him by Brady. Defendant claims that Brady failed to warn him that serotonin syndrome was a possible side effect of the combination of these medications. Defendant also claims that he was experiencing increased suicidal ideations at the time of the offense, which was a side effect of Buspar.

¶ 22	At the time of the offense, section 6-3(b) of the Criminal Code of 1961 (720 ILCS 5/6-3(b) (West 1992)) provided: "A person who is in an intoxicated or drugged condition is criminally responsible for conduct unless such condition *** [i]s involuntarily produced and deprives him of substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." Defendant argues that he could not have raised the defense of involuntary intoxication at his trial because the defense of involuntary intoxication based on the unwarned side effects of prescription medication was not available until over 10 years after the trial when the supreme court decided *Hari*, 218 Ill. 2d 275.

¶ 23	In *Hari*, our supreme court held that the involuntary intoxication defense was available to a defendant claiming that he was involuntarily intoxicated due to an unwarned side effect of a prescription medication. *Id.* at 292-93. The court reasoned: "We find that the drugged condition alleged here—an unexpected adverse side effect of a prescription drug that was unwarned by the prescribing doctor, the [Physicians' Desk Reference] or the package insert—is 'involuntarily produced' within the plain meaning of the involuntary intoxication affirmative defense statute." *Id.* at 292. The *Hari* court rejected the State's argument that, based on prior case law, the plain meaning of "involuntarily produced" was limited to instances of trick, artifice, or force. *Id.* at 293. The *Hari* court overruled several prior decisions to the extent that they could "be read as excluding the unexpected and unwarned adverse side effects from medication taken on doctor's orders from the plain meaning of 'involuntarily produced.' " *Id.* at 294.

¶ 24	In *People v. Alberts*, 383 Ill. App. 3d 374, 382 (2008), the Fourth District held that "*Hari* announced a new rule because it broaden[ed] the scope of the defense of involuntary intoxication beyond the plain language of the statute and [did] not constitute a mere application of existing precedent." The *Alberts* court further held that the new rule announced in *Hari* should be given full retroactive effect because it was tantamount to a rule that limits the conduct proscribed by a criminal statute. *Id.* at 383. Based on the retroactive application of *Hari*, the *Alberts* court held that the defendant made a substantial showing of a claim of actual innocence based on his claim that he was involuntarily intoxicated at the time of the offense due to the quantity of psychotropic medication that he was taking. *Id.* at 380.

¶ 25	Defendant contends that the evidence in support of his involuntary intoxication defense should be considered "newly discovered" due to the change in the law after his trial pursuant to the holdings in *Hari* and *Alberts*, though he acknowledges that the fact that he was taking Desyrel and Buspar was known at the time of his trial. We question the propriety of treating defendant's claim as an actual innocence claim because it appears that the claim is based on a newly available affirmative defense rather than newly discovered evidence. Our supreme court has held that "[t]he elements of a claim of actual innocence are that the evidence in support of the claim must be 'newly discovered'; material and not merely cumulative; and of such conclusive character that it would probably change the result on retrial." *People v. Edwards*, 2012 IL 111711, ¶ 32 (citing *People v. Ortiz*, 235 Ill. 2d 319, 333 (2009)). However, even assuming that the evidence in support of defendant's claim may properly be considered "newly discovered," we find that the circuit court did not err in denying defendant's motion for leave to file a second successive postconviction petition.

¶ 26	A defendant must obtain leave of court before filing a successive postconviction petition. *Id.* ¶ 24. Where a defendant seeks to file a successive postconviction petition raising a claim of actual innocence, "leave of court should be denied only where it is clear, from a review of

- 5 -

the successive petition and the documentation provided by the petitioner that, as a matter of law, the petitioner cannot set forth a colorable claim of actual innocence." *Id.* "Stated differently, leave of court should be granted when the petitioner's supporting documentation raises the probability that 'it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence.' " *Id.* (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

¶ 27    Here, the allegations in the petition and the supporting documentation may have shown that defendant suffered from unwarned side effects of prescription medication at the time of the offense such that the "involuntarily produced" component of the involuntary intoxication defense was satisfied. However, the allegations and supporting documentation did not show that these alleged side effects rendered defendant intoxicated to the degree that he lacked "substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." 720 ILCS 5/6-3(b) (West 1992). Accordingly, the motion for leave and the supporting documentation defendant has submitted fail to "raise[ ] the probability that 'it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence.' " *Edwards*, 2012 IL 111711, ¶ 24 (quoting *Schlup*, 513 U.S. at 327).

¶ 28    In his motion, defendant alleged that Brady failed to warn him that serotonin syndrome was a potential side effect of taking Buspar and Desyrel simultaneously. Defendant attached documentation supporting his allegations that he was taking Buspar and Desyrel and that serotonin syndrome was a potential side effect. Defendant also alleged that he was suffering from symptoms associated with serotonin syndrome at the time of the offense—specifically, heightened irritability, confusion and "altered consciousness." However, it is not apparent that experiencing heightened irritability or confusion would deprive defendant of the substantial capacity to know that shooting the victims was a criminal act or to refrain from engaging in that conduct. Also, the term "altered consciousness" is vague, and neither the allegations in the petition nor the supporting documentation indicate how defendant's consciousness was altered at the time of the offense.

¶ 29    Defendant also alleged that he was experiencing increased suicidal ideation at the time of the offense, which was a side effect of Buspar. Defendant attached documentation showing that suicidal ideation was an adverse event experienced by some people who took Buspar and that he was found to be at risk for suicide after the offense. However, defendant did not allege that Brady failed to warn him that suicidal ideation was a potential side effect. Moreover, it is not apparent that increased thoughts of suicide would deprive defendant of the capacity to appreciate the criminality of shooting the victims or to conform his conduct to the requirements of the law.

¶ 30    Defendant relies on Chapman's opinion that defendant's capacity to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law was substantially impaired in support of his claim that he was involuntarily intoxicated. However, Chapman did not opine that defendant was impaired in this regard due to the symptoms of serotonin syndrome that defendant was allegedly experiencing. Rather, Chapman believed that defendant's ability to appreciate the criminality of his conduct was substantially impaired by his distorted belief that killing Wolf and himself would free them from a painful world and allow them to be together after death. Chapman testified that this belief was due to defendant's depression. Chapman's opinion was presented to the jury in support of defendant's insanity

defense and was ultimately rejected.

¶ 31                                    III. CONCLUSION
¶ 32        The judgment of the circuit court of Bureau County is affirmed.

¶ 33        Affirmed.

¶ 34        JUSTICE McDADE, dissenting:

¶ 35        Initially, I do not share the majority's concerns about the propriety of framing defendant's claim as an actual innocence claim on the basis that the claim is based on a newly available affirmative defense rather than newly discovered evidence. See *supra* ¶ 25. Typically, an actual innocence claim must be supported by newly discovered evidence "that was not available at [the] defendant's trial and that the defendant could not have discovered sooner through diligence." *People v. Barrow*, 195 Ill. 2d 506, 541 (2001). The purpose of this requirement is to avoid having defendants wait until after being convicted to reopen the case to raise a claim of innocence that could have been presented during the trial. This rationale applies with equal force to defendant's involuntary intoxication claim. Prior to the supreme court's recognition of involuntary intoxication from the unwarned side effects of prescription medication as a viable defense, the fact that defendant had recently been prescribed Buspar and Desyrel and had experienced unwarned side effects from them had neither relevance nor meaning in his case. The decision in *Hari* was the first time the fact that he was experiencing unwarned side effects from the medication acquired significance *as evidence*. Thus, defendant could not, through the exercise of due diligence, have presented the involuntary intoxication during his trial because the defense itself was not available until the supreme court decided *Hari* several years later and the tender would have been properly rejected as irrelevant. Accordingly, I believe that the facts supporting the newly available involuntary intoxication defense may be considered new for the purposes of defendant's actual innocence claim, even though they were known to defendant at the time of the trial.

¶ 36        Moreover, I would find that defendant has presented a colorable claim of actual innocence such that he should have been granted leave to file a successive postconviction petition that could have been tested at the second stage. That is, I do not believe that "it is clear, from a review of the successive petition and the documentation provided by the petitioner that, as a matter of law, the petitioner cannot set forth a colorable claim of actual innocence." *Edwards*, 2012 IL 111711, ¶ 24. The allegations in the motion for leave to file a successive petition and the supporting documentation indicate that defendant was suffering from unwarned side effects of prescription medications at the time of the offense. These side effects included heightened irritability, confusion, altered consciousness, and increased suicidal ideation. If severe, these symptoms could have deprived defendant of the substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law such that the involuntary intoxication defense would apply. A viable involuntary intoxication defense "raise[s] the probability that it is more likely than not that no reasonable juror would have convicted [defendant] in the light of the new evidence." *Id.* ¶ 31.

¶ 37        For the foregoing reasons, I would reverse the judgment of the circuit court and remand the matter for further postconviction proceedings. Therefore, I respectfully dissent.