**2021 IL 125891**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

_____

(Docket No. 125891)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v.
STEVEN A. TALIANI, Appellant.

*Opinion filed October 7, 2021.*

CHIEF JUSTICE ANNE M. BURKE delivered the judgment of the court, with opinion.

Justices Garman, Theis, Neville, Michael J. Burke, and Overstreet concurred in the judgment and opinion.

Justice Carter took no part in the decision.

## OPINION

¶ 1    After a jury trial in Bureau County, Steven A. Taliani (petitioner) was convicted of first degree murder (720 ILCS 5/9-1(a)(2) (West 1992)) and aggravated battery with a firearm (*id.* § 12-4.2(a)(1)) in relation to the July 12, 1994, shooting death

of his girlfriend, Francee Wolf, and the shooting and injury of Wolf's mother, Clementina Frasco. A direct appeal, two postconviction petitions, and a motion for relief from judgment were all unsuccessful.

¶ 2    At issue now is petitioner's motion for leave to file a second successive postconviction petition, in which he asserts that he has set forth a colorable claim of actual innocence based on "a change in the law that allows for a new affirmative defense [which] constitutes newly discovered evidence for purposes of an actual innocence claim." The circuit court rejected this argument and denied petitioner leave to file his second successive postconviction petition. That ruling was affirmed on appeal. 2020 IL App (3d) 170546. We granted petitioner leave to appeal to this court (Ill. S. Ct. R. 315 (eff. Oct. 1, 2019)) and now affirm the circuit court's denial of petitioner's motion for leave to file a second successive postconviction petition.

¶ 3                              BACKGROUND

¶ 4    On July 12, 1994, Clementina Frasco arrived home from work around 11 p.m. and found that her 22-year-old daughter, Francee Wolf, was not there. Attempting to locate her daughter, Frasco called one of Wolf's friends and learned that Wolf was at petitioner's home. Frasco was aware that petitioner and Wolf had been dating since the summer of 1993 but that Wolf wanted to end her relationship with petitioner because he had become overly possessive and physically abusive. In late December 1993, Cari Carlson, Wolf's cousin, witnessed petitioner slap, bite, choke, and verbally insult Wolf before throwing Wolf to the ground. Wolf had also confided to her friends that, on one occasion, petitioner admitted to Wolf that he held a shotgun to her head as she slept and told her he had plans to kill her and then commit suicide.

¶ 5    Frasco called petitioner's home, but petitioner told Frasco that Wolf was not there. Concerned for her daughter's well-being, Frasco drove to petitioner's home, knocked on the door, and called out to her daughter. No one answered, but shortly thereafter Frasco heard a loud noise[1] come from inside the house. Wolf, dressed only in a pair of silk shorts, then came running out of the house, crying and screaming "Psycho." Wolf was bleeding, and she told Frasco that petitioner hit her

_____

[1]The loud noise was later determined to be the discharge of a shotgun.

head. Wolf got into the front passenger side of Frasco's car, and Frasco attempted to drive away.

¶ 6    Petitioner then ran out of the house, dressed only in a pair of gray boxer shorts, carrying a shotgun. He went to the driver's side of Frasco's car and fired a shot through the driver's side window, attempting to hit Wolf but instead hitting the side of Frasco's head. Petitioner then walked around to the passenger side, where Wolf was bent over in the front seat with her head down. Petitioner fired a shot through the passenger-side window, striking Wolf in the back, killing her.

¶ 7    Officer Richard Taylor, who was patrolling in the area, heard the shots and arrived on the scene as Frasco's car rolled into the street, jumped the curb, and came to a stop. Frasco was screaming, "Help, we've been shot." Officer Taylor radioed for an ambulance as he went to the car to check on the occupants. When Taylor checked on Frasco, she identified petitioner as the person who shot her and her daughter.

¶ 8    Officer Taylor then noticed a man, dressed only in boxer shorts, get into a black car and drive off at a high rate of speed. Taylor radioed his partner, Officer Kevin Sangston, who pursued the fleeing car and, ultimately, apprehended and arrested petitioner.

¶ 9    On August 9, 1994, petitioner was indicted on charges of first degree murder and aggravated battery with a firearm. Appointed counsel moved to have petitioner examined for fitness to stand trial and evaluated regarding his mental status at the time of the shootings. The trial court granted the motion. However, before petitioner was examined for fitness, he obtained new defense counsel, who withdrew the motion and entered a plea of not guilty by reason of insanity. A psychiatrist, Dr. Robert E. Chapman, was retained to examine petitioner and evaluate whether he was sane at the time of the shootings.

¶ 10    Later that year, petitioner was tried before a jury. At trial, the State presented extensive testimony from numerous witnesses regarding petitioner's behavior in the weeks and hours before the shootings. Several of Wolf's friends testified that, during the three weeks prior to the shooting, petitioner had become increasingly jealous about a perceived sexual relationship between Wolf and a man named

Kevin Trovero. Witness testimony also provided a timeline of petitioner's activity on Tuesday, July 12, 1994, the day of the shooting.

¶ 11    Testimony revealed that petitioner began the day by going to work at the jewelry store he owned. He had lunch with Marlo Capponi, whom he had been dating since January 1994.[2] Petitioner and Capponi made plans to get together later that evening. After lunch, petitioner went back to the jewelry shop, where he stayed until he closed around 7 p.m. As petitioner was driving home, he saw a friend, Michelle Castelli, driving her car. While the two cars were stopped at a traffic light, they arranged to meet around 7:30 p.m. at a bar named Ellie's Tap. Castelli testified that, at Ellie's, petitioner told her that he loved Wolf but that he was concerned she might be seeing another man (Trovero). Castelli testified that she knew petitioner well and, although he expressed concern about Wolf, he appeared to be his normal self and did not appear to be under the influence of either drugs or alcohol.

¶ 12    The bartender at Ellie's testified that he had known petitioner for eight years and, on the night of the shootings, he saw petitioner come into the bar and have three or four beers. He said petitioner "acted normally" and looked "totally sober" when he left the bar around 8:30 p.m.

¶ 13    After leaving Ellie's bar, petitioner went to Verucchi's Bar and Restaurant. Arthur Verucchi was working that night, and he testified that petitioner arrived around 9:30 p.m. and stayed at the bar for 30 to 45 minutes. During that time, petitioner had one vodka and water. Verucchi said petitioner did not act strangely or appear disoriented or confused, nor did he seem to be under the influence of alcohol or drugs. Two other bar patrons at Verucchi's that night confirmed Arthur's testimony. After leaving Verucchi's, petitioner went home, intending to meet with Capponi later on. But when he arrived home, Wolf was there.

¶ 14    Kevin Trovero testified that, at about 11:15 p.m., petitioner phoned his home. His wife answered the phone, and he got on another extension. Petitioner asked Trovero's wife if she knew her husband was dating Wolf. Kevin then spoke up,

---

[2]Capponi testified that she had "heard rumors" that petitioner was also dating Wolf. However, she said petitioner denied it when she asked him about Wolf. After his arrest, Capponi regularly visited petitioner in jail.

denying petitioner's accusations. Both Kevin and his wife testified that, although petitioner was accusatory and angry, he seemed in control of his faculties and was not ranting or incoherent. After this phone call, petitioner and Wolf argued. Then Frasco arrived at petitioner's home, and the shootings occurred as detailed above.

¶ 15        At trial, Officer Sangston testified that, just after midnight, in the early morning on July 13, 1994, he received instructions from Officer Taylor to apprehend the driver of a black car with license plate A-U-S-T-N-T. Soon after receiving the radio message, Sangston observed the vehicle and activated his lights. The car sped away, and Sangston pursued with lights and siren on. The black vehicle continued without stopping, passing several stop signs, then turned onto Route 6 and sped up, traveling at approximately 75 miles per hour. When the vehicle traveled through an area known as "the curves," which was under construction, the driver hit some construction barrels, lost control, and crashed into the guardrail.

¶ 16        Because Officer Sangston was told the driver could be armed, he drew his gun and situated himself behind the door of his police car. The driver got out of his vehicle and started walking slowly toward Sangston with his hands up. Petitioner said, "I'm all out of shells." Sangston recognized the driver as petitioner from previous encounters and ordered him to get down on the ground. Petitioner disobeyed Sangston's command and, instead, continued to walk slowly toward Sangston, saying "Shoot me, please shoot me." Sangston responded, "Steve, just get on the ground, we'll talk about it." But petitioner continued to walk slowly toward Sangston and said, "There is nothing to talk about. I have nothing left to live for. Shoot me." Petitioner also threatened to take Sangston's gun away from him and shoot himself.

¶ 17        When petitioner got closer, Sangston holstered his gun and pepper sprayed petitioner. Petitioner was then handcuffed and placed in Sangston's police car. Once petitioner was secured, Sangston went to petitioner's vehicle and recovered a double-barrel, sawed-off 20-gauge shotgun from the passenger-side floor. Petitioner and the gun were transported to the police station.

¶ 18        While being transported, petitioner said, "Oh my God, I can't believe I did that," and "Why the hell does she have to show up, we had everything worked out." At the police station, petitioner continued to ask for someone to shoot him until Sangston moved him to where he was to be interviewed. At that point, petitioner

asked, "What's going on." Sangston replied that someone would be in to question him. Petitioner then commented, "Hell of a way to get a DUI." Sangston testified that, until then, there had been no mention of alcohol consumption or "DUI" by anyone and that he saw no evidence that petitioner was under the influence of "anything."

¶ 19     Sangston stayed with petitioner while he waited to be interviewed. During this time, petitioner apologized to Sangston for "putting him through all this." Sangston testified that, based on his observations of petitioner and their conversations, he believed that petitioner was oriented as to time, place, and circumstance; understood the criminality of his earlier conduct; and knew right from wrong.

¶ 20     At the Spring Valley Police Department, in the early morning hours of July 13, 1994, petitioner was interviewed by Spring Valley police chief Doug Bernabei, who was accompanied by Mike Miroux, an investigator for the Bureau County Sheriff's Department. Both Chief Bernabei and Miroux testified at trial, providing similar accounts of the interview with petitioner, which took place from approximately 1 a.m. until 2:45 a.m. After petitioner was advised of his rights, he signed a waiver and agreed to speak with them. Petitioner also signed a consent form, allowing the police to enter his house to search it.

¶ 21     Chief Bernabei testified that, during the interview, petitioner gave three different statements. Initially, petitioner told Chief Bernabei and Miroux that he remembered going to Verucchi's that night and leaving there at about 9:30 p.m. but that he had no recollection of the rest of the evening until he was arrested by Officer Sangston.

¶ 22     Chief Bernabei testified that he asked petitioner to tell him everything he had done since the previous Friday. In response, petitioner related the events of the weekend and then continued on through Tuesday, the day of the shooting. This time, petitioner said that, when he got home from Verucchi's, Wolf was at his house. Petitioner remembered that Wolf got angry and they argued. He said Wolf left his house and then stood outside screaming obscenities at him. Petitioner told them he locked the door so Wolf could not get back inside but that then Wolf drove away in her car and petitioner decided to go after her. Petitioner said he got in his car and started driving around, trying to find Wolf. While searching for Wolf, petitioner said he was arrested for driving under the influence.

¶ 23    Chief Bernabei testified that he then asked petitioner about the sawed-off shotgun that was found in his car. Bernabei testified that, initially, petitioner denied he had a gun in his car. Later, however, petitioner put his head in his hands, got very "somber," and said he would tell Bernabei "the truth."

¶ 24    In this third statement, petitioner told Chief Bernabei and Miroux that Wolf was at his house when he got home from Verucchi's. Petitioner told them he and Wolf had consensual sexual relations. Afterward, however, they got into an argument because he was dating Marlo Capponi and he accused Wolf of dating Trovero. Petitioner said that Wolf became angry because he called Trovero on the phone. Petitioner then claimed that he thought Wolf was reaching for his shotgun, which she knew he kept under his bed. Instead, petitioner got the gun, and when Wolf taunted him, he fired two shots in the bedroom. Wolf then ran out of his house screaming, "Psycho."

¶ 25    Petitioner told Chief Bernabei that, when Wolf ran out of the house, he got two shells from his dresser drawer and reloaded his double-barrel shotgun. Then he ran after Wolf. Petitioner told Chief Bernabei he saw Wolf in his yard, standing near a tree, and that he shot at her to scare her so she would go back in the house where he planned to kill her according to "his plan." Although petitioner did not say anything about Frasco, he admitted that he saw Wolf get into a car and that he fired the shotgun at Wolf through the driver's side window because he wanted to kill Wolf. Petitioner also admitted that he knew he was not arrested for driving under the influence.

¶ 26    Around 3 a.m., the officers who searched petitioner's house brought to the station a typewritten letter they found in the kitchen of petitioner's home and a typewritten note that had been attached to the door of petitioner's home. After obtaining these documents, Chief Bernabei questioned petitioner a second time. He showed the documents to petitioner, who explained that he had written out the note and letter a few weeks earlier and then typed them, using the typewriter at the jewelry store he owned. Chief Bernabei asked petitioner to sign and date the pages of the letter as they reviewed it together.

¶ 27    Petitioner explained to Chief Bernabei that he had been thinking about killing Wolf for a long time and that he had a plan, which he claimed to have discussed with Wolf. The plan was to kill Wolf at his home and then commit suicide so they

- 7 -

could be together forever. Petitioner also told Chief Bernabei that, a few weeks earlier, he told his sister-in-law that he was depressed and thinking of committing suicide. She told him to get help, and petitioner's brother came to petitioner's house and took his shotgun away. Petitioner then made an appointment to see a psychiatrist, Dr. Brady. Petitioner said he kept the appointment, which lasted about two hours, but he did not feel any better after talking to the doctor. Petitioner also admitted to Chief Bernabei that, even though he had decided to kill Wolf and commit suicide prior to his appointment with Dr. Brady, he did not tell Dr. Brady his plan. Instead, immediately after the appointment, he went to his store to type the documents regarding his murder-suicide plan. Later on, he retrieved the shotgun from his brother's house.

¶ 28   Petitioner told Chief Bernabei that Dr. Brady prescribed two medications for him—one was to be taken three times a day, the other once at night. When Chief Bernabei asked petitioner if he took the medicine, petitioner said that he did, but not as directed. He said that he skipped doses of the one medication he was supposed to take three times a day because it bothered his stomach.

¶ 29   The typewritten note and letter written by petitioner were offered into evidence. The note, which had been posted to the front door of petitioner's home, stated:

> "DO NOT COME IN ALONE!!!!!!!! WHAT YOU ARE GOING TO FIND INSIDE MAY NOT BE APPEALING. I AM VERY SORRY. ITS OK. BEFORE YOU GO ANY FARTHER READ THE LETTER ON THE TABLE. THAT WILL HELP EXPLAIN SOME. ITS OK. I'M NOT AFRAID ANYMORE."

¶ 30   The three-page letter addressed to "Chuck and Julie," which petitioner signed and dated as he reviewed it with Chief Bernabei, had been found inside the home, on the kitchen table. In this letter, petitioner left detailed instructions regarding the distribution of his belongings and the handling of his business affairs. The following statement was also in the letter: "I can't have Francee do this to anyone else especially me. Try to keep us together if you can."

¶ 31   After the State rested, defense counsel called two psychiatrists to testify for the defense: Dr. Richard Brady, who had been petitioner's treating psychiatrist, and Dr.

Robert Chapman, who had examined petitioner after the shootings and was called as an expert witness regarding petitioner's sanity at the time of the shootings.

¶ 32    Dr. Brady testified that he saw petitioner in his office on June 27, 1994, approximately two weeks prior to the shootings. During the appointment, petitioner reported that he was feeling depressed and had had suicidal thoughts "the weekend before last." Dr. Brady said that petitioner assured him that he was not having any suicidal or homicidal thoughts at that time and that he "couldn't" harm himself or others. Dr. Brady further testified that he diagnosed petitioner with "recurrent major depressive disorder," general anxiety, and alcohol dependence. He prescribed two medications for depression, BuSpar and Desyrel, and recommended that petitioner obtain individual therapy. An appointment was made for July 11, but petitioner did not show up for that appointment.

¶ 33    Dr. Chapman, the psychiatrist retained by defense counsel, testified that he had examined petitioner on September 1, 1994, approximately nine weeks after the shootings. His diagnosis, after evaluating petitioner and reading "all of the official reports," was that petitioner suffered from major affective disorder, obsessive-compulsive disorder, and depression with suicidal ideation. Dr. Chapman reported that petitioner had a high risk of suicide and apparently attempted to commit suicide at least once while he was awaiting trial.[3]

¶ 34    Dr. Chapman also testified that, during the examination, petitioner appeared anxious, "quite confused, disorganized, and prone to intense feelings of panic." Additionally, Dr. Chapman testified that petitioner reported feeling as if he was "losing his mind" and having "bizarre and unusual sensory experiences and confused thinking."

¶ 35    Although Dr. Chapman was aware that petitioner had taken the medications BuSpar and Desyrel, prescribed by Dr. Brady, he made no correlation between petitioner's mental status at the time of the shootings and the medications he was prescribed. Dr. Chapman testified that *petitioner's depression* had "substantially impaired his capacity to appreciate the criminality of his behavior." On cross-

---

[3]One of the guards testified that the suicide attempt did not appear to be serious. Petitioner used a broken piece of plastic to cut his wrist. There was very little blood, and petitioner did not need to be hospitalized.

examination, Chapman emphasized, "I didn't say he was unable [to appreciate the criminality of his behavior], I said he was substantially impaired."

¶ 36    After hearing all the evidence, the jury rejected the insanity defense and found petitioner guilty of both first degree murder and aggravated battery with a firearm. The trial court sentenced petitioner to an extended term of 70 years' incarceration for first degree murder and a consecutive term of 30 years for aggravated battery with a firearm, for a total sentence of 100 years.

¶ 37    In his direct appeal, petitioner argued that his sentence was excessive and that the trial court should have entered a directed verdict of not guilty by reason of insanity because the evidence proved that he was legally insane at the time of the shooting. The appellate court affirmed the convictions and sentence (*People v. Taliani*, No. 3-94-0921 (1995) (unpublished order under Illinois Supreme Court Rule 23)), and this court denied his petition for leave to appeal.

¶ 38    In 1996, petitioner filed *pro se* a postconviction petition alleging that his trial counsel and appellate counsel provided ineffective assistance. Petitioner cited 17 separate errors by trial counsel, including counsel's failure to file a motion to suppress petitioner's confession. Petitioner also made six claims of ineffective assistance of appellate counsel. The trial court dismissed this postconviction petition at the first stage, and the appellate court affirmed. *People v. Taliani*, No. 3-96-0672 (1997) (unpublished order under Illinois Supreme Court Rule 23). This court denied the petition for leave to appeal.

¶ 39    In 2000, Taliani filed *pro se* a motion for relief from judgment, claiming in part that he should receive a new trial because a State witness had testified in a civil suit that petitioner's shooting of Frasco was accidental. Petitioner later amended the motion to add an *Apprendi* claim (see *Apprendi v. New Jersey*, 530 U.S. 466 (2000)). The trial court denied the motion, and the appellate court affirmed. *People v. Taliani*, No. 3-00-0913 (2003) (unpublished order under Illinois Supreme Court Rule 23). We denied leave to appeal.

¶ 40    In 2002, while the appeal of his 2000 motion was still pending, petitioner filed a second petition for relief from judgment, alleging that Dr. Brady, one of the psychiatrists who had testified at his trial, had been convicted of practicing medicine without a license. Petitioner later amended his motion with several

additional claims and accompanying documentation. This motion was treated as a successive postconviction petition, and in 2003, the trial court appointed the public defender to represent petitioner.

¶ 41 Several months later, petitioner successfully moved to replace the public defender with retained counsel. After a number of additional motions were ruled on, defense counsel filed an amended successive postconviction petition in 2014. In this amended petition it was alleged that defense counsel knew at the time of trial that petitioner was taking BuSpar and Desyrel, medications that Dr. Brady had prescribed, and that there was medical information at the time of trial that indicated this combination of medications "can lead to a serious condition known as 'serotonin syndrome' " that can cause "irritability, altered consciousness, confusion, hallucination, coma," and "suicidal thoughts." It was claimed in the amended petition that trial counsel had provided ineffective assistance by withdrawing the petition for a fitness hearing and by failing to seek a second degree murder instruction based on the prescribed medication he was taking. In support of this ineffectiveness claim, petitioner attached to the petition various medical articles about serotonin syndrome, which had been published prior to petitioner's 1994 trial and, therefore, would have been available to trial counsel.

¶ 42 The trial court dismissed the successive petition, finding that petitioner failed to show cause and prejudice and, therefore, the claims were barred by *res judicata* because petitioner could have raised them in his first postconviction petition.

¶ 43 Petitioner appealed the dismissal, arguing that he had met the cause and prejudice standard to file a successive petition on his ineffective assistance claims. Petitioner also alleged that he did not need to show cause and prejudice regarding his claim that trial counsel was ineffective for failing to proffer a jury instruction on second degree murder because this claim was an actual innocence claim. Although petitioner admitted that he did not meet the general requirements for proving an actual innocence claim, he argued that he did not need to do so because he was only claiming to be "actually innocent" of "a certain classification of crimes," *i.e.*, first degree murder. Petitioner explained his argument in this way— if a second degree murder instruction had been given to the jury, he would have been found guilty of second degree murder and, therefore, he would have been "actually innocent" of the crime of first degree murder, for which he was convicted.

¶ 44     The appellate court affirmed the dismissal of the successive petition, finding that the ineffectiveness claims could have been raised in his initial petition and failed to meet the cause and prejudice test. The court also found that petitioner's alleged "actual innocence" claim "defies logic and finds no support in Illinois law." *People v. Taliani*, 2016 IL App (3d) 150478-U, ¶ 21.

¶ 45     In 2017, petitioner filed, *pro se*, a motion seeking leave to file a second successive postconviction petition, which is the subject of the appeal now before this court. Petitioner contended in the circuit court that he should be allowed to file this successive petition because his claim is one of "actual innocence." More specifically, petitioner alleged that he was actually innocent of the crimes for which he was convicted because, at the time he committed those offenses, he was involuntarily intoxicated due to the unwarned side effects of prescription medications, BuSpar and Desyrel, which caused him to suffer from serotonin syndrome. Petitioner attached some of the same literature on serotonin syndrome that he had attached to his earlier postconviction petition.

¶ 46     Petitioner acknowledged in the circuit court that an actual innocence claim must be supported by "newly discovered evidence" and that the evidence that he took prescription medications that could cause serotonin syndrome was not "newly discovered." He argued, nonetheless, that the affirmative defense of involuntary intoxication based on unwarned side effects from prescription medication was not recognized in Illinois until long after his trial, when *People v. Hari*, 218 Ill. 2d 275 (2006), was decided. Petitioner claimed that this newly available affirmative defense constituted "newly discovered evidence" for purposes of his actual innocence claim. Petitioner further argued that it was more likely than not that, had he been able to raise this affirmative defense at the time of his trial, the jury would have found that he was involuntarily intoxicated and, as a result, he would have been found not guilty of the crimes for which he was convicted.

¶ 47     The circuit court denied petitioner's motion for leave to file his successive postconviction petition and dismissed the petition, holding that petitioner failed to present a colorable claim of actual innocence because he failed to establish with any reasonable degree of certainty that no reasonable juror would have convicted him had the jury considered the affirmative defense of involuntary intoxication due to unwarned side effects of prescribed medication.

¶ 48    Petitioner appealed, and a majority of the appellate court affirmed the circuit court. 2020 IL App (3d) 170546. The majority, while questioning whether it was even proper to permit a newly available affirmative defense to serve as the newly discovered evidence element of an actual innocence claim, went on to hold that "the allegations and supporting documentation did not show that these alleged side effects rendered defendant intoxicated to the degree that he lacked substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." (Internal quotation marks omitted.) *Id.* ¶ 27. Justice McDade dissented and would have found that petitioner set forth a colorable claim of actual innocence. *Id.* ¶ 36 (McDade, J., dissenting).

¶ 49    We granted petitioner leave to appeal to this court.

¶ 50                                   ANALYSIS

¶ 51    The single issue before us is whether the trial court erred when it denied petitioner's motion for leave to file a second successive postconviction petition. Petitioner contends that leave should have been granted because he presented a colorable claim of actual innocence.

¶ 52    Where, as here, a petitioner raises an actual innocence claim in a successive postconviction petition, the trial court should deny leave only where, as a matter of law, no colorable claim of actual innocence has been presented. *People v. Edwards*, 2012 IL 111711, ¶¶ 31-33. Since this is a legal question, we review *de novo* the circuit court's denial of petitioner's motion for leave to file his successive postconviction petition. *People v. Robinson*, 2020 IL 123849, ¶ 40.

¶ 53    The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2016)) provides a statutory remedy to criminal defendants who claim that substantial violations of their constitutional rights occurred at trial. *Edwards*, 2012 IL 111711, ¶ 21. Because a postconviction petition is a collateral attack on the judgment, issues that were raised and decided on direct appeal are barred from consideration by the doctrine *of res judicata*, while issues that could have been raised, but were not, are forfeited. *People v. Holman*, 2017 IL 120655, ¶ 25. In addition to this procedural default rule, both the Act and our caselaw make clear that the filing of only one postconviction proceeding is contemplated. *Id.*; see also

- 13 -

725 ILCS 5/122-3 (West 2016) ("[a]ny claim *** not raised in the original or an amended petition is waived").

¶ 54        Because successive petitions impede the finality of criminal litigation, the rules barring successive petitions will be relaxed only " ' "when fundamental fairness so requires." ' " *Holman*, 2017 IL 120655, ¶ 25 (quoting *People v. Coleman*, 2013 IL 113307, ¶ 81, quoting *People v. Pitsonbarger*, 205 Ill. 2d 444, 458 (2002)); see also *Edwards*, 2012 IL 111711, ¶ 23; *People v. Ortiz*, 235 Ill. 2d 319, 329 (2009); *People v. Washington*, 171 Ill. 2d 475, 488 (1996).

¶ 55        In Illinois, we have recognized only two exceptions where "fundamental fairness" compels the bar against successive petitions to be lifted. *Coleman*, 2013 IL 113307, ¶ 82. The first is the "cause and prejudice" exception, which has been codified in the Act. See 725 ILCS 5/122-1(f) (West 2016). The second is the "fundamental miscarriage of justice" exception, which requires a petitioner to make a persuasive showing of "actual innocence." See *Coleman*, 2013 IL 113307, ¶ 83; *Edwards*, 2012 IL 111711, ¶ 23; *Ortiz*, 235 Ill. 2d at 329.

¶ 56        In *Washington*, we were tasked with deciding whether a "free standing" claim of actual innocence based on new evidence could be raised in a petition under the Act. We explained that a "free standing" claim of actual innocence is one in which newly discovered evidence is not being used to supplement an assertion of a constitutional violation with respect to the defendant's trial or that the evidence at trial was insufficient to convict the defendant beyond a reasonable doubt. *Washington*, 171 Ill. 2d at 479-80. Rather, a "free standing" claim of actual innocence is one in which newly discovered evidence makes a persuasive showing that the petitioner did not commit the charged offense and was, therefore, wrongfully convicted. *Id.* at 489.

¶ 57        Since postconviction relief is unavailable if no constitutional right is implicated in the asserted claim, we considered in *Washington* whether, as a matter of procedural or substantive due process, additional process should be afforded a petitioner when newly discovered evidence indicates that the convicted petitioner is actually innocent. *Id.* at 486-87. We found that there was footing in the due process clause of our Illinois Constitution for asserting freestanding innocence claims based upon newly discovered evidence. *Id.* at 489. We reasoned that imprisonment of the innocent would be so conscience shocking as to trigger

operation of substantive due process. *Id.* at 487-88. Thus, we held that, "as a matter of Illinois constitutional jurisprudence," a claim of newly discovered evidence that makes a persuasive showing that the petitioner is factually innocent of the crime for which he was convicted is cognizable under the Act as a matter of due process. *Id.* at 489.

¶ 58    Procedurally, a petitioner who claims actual innocence in a successive postconviction petition must first obtain leave of court to file the petition. *Id.*; *People v. Wrice*, 2012 IL 111860, ¶ 47; 725 ILCS 5/122-1(f) (West 2016). Substantively, however, a petitioner need not show cause and prejudice (*Ortiz*, 235 Ill. 2d at 330) but must support his claim of actual innocence with evidence that is "newly discovered, material and not merely cumulative, and of such conclusive character that it would probably change the result on retrial" (*id.* at 333 (where a defendant sets forth a claim of actual innocence in a successive postconviction petition, the defendant is excused from showing cause and prejudice and, instead, must meet the *Washington* standard)). *Washington*, 171 Ill. 2d at 496; see also *People v. Morgan*, 212 Ill. 2d 148, 154 (2004) (because conviction of an innocent person would violate the due process clause of the Illinois Constitution, we have recognized that postconviction petitioners have the right "to assert a claim of actual innocence based on newly discovered evidence"); *People v. Quickle*, 2020 IL App (3d) 170281, ¶¶ 18, 20 (evidence in support of an actual innocence claim must be newly discovered, material and not merely cumulative, and of such conclusive character that it would probably change the result on retrial; for purposes of the actual innocence exception, "actual innocence" means factual innocence, not mere legal insufficiency).

¶ 59    In *Edwards*, we stated that a colorable claim of actual innocence requires evidence that "raises the probability that 'it is more likely than not that no reasonable juror would have convicted [the petitioner] in the light of the new evidence.' " *Edwards*, 2012 IL 111711 ¶ 24 (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)). We made it clear in *Coleman* that the standard set forth in *Edwards*, and our holding in *Ortiz* that actual innocence claims need not show cause and prejudice, did not alter the requirements for filing an actual innocence claim in a successive postconviction petition. See *Coleman*, 2013 IL 113307, ¶ 93. We stated, "Our commitment to [the *Washington* standard] is unwavering. We have not diluted the substantive standard for actual-innocence claims, as the State thinks we did in

*Ortiz.* And we have not strengthened that standard, as the State hopes we did in *Edwards.*" *Id.* Thus, the *Edwards* standard is merely a restatement of the well-established rule that, to set forth a colorable claim of actual innocence in a successive postconviction petition, the petitioner must produce *newly discovered evidence* that, when considered along with all the evidence presented at trial, would probably lead to a different result on retrial. *Id.* ¶ 96; *Washington*, 171 Ill. 2d at 489.

¶ 60 Petitioner contends that he has met all the requirements for setting forth a colorable claim of actual innocence. He concedes that it was known at the time of his trial that he was taking the prescribed medications, BuSpar and Desyrel, when he committed the offenses for which he was convicted and, therefore, this is not newly discovered evidence. However, petitioner argues that it was not known at the time of his trial that these two medications, taken together, could cause serotonin syndrome, a condition that may bring about mental status changes such as heightened irritability, altered consciousness, and confusion. Petitioner claims this information was only developed in the last several years.[4] However, he goes on to argue that, even if this information had been available at the time of his trial, he could not have raised the affirmative defense of involuntary intoxication due to unwarned side effects from prescription medication because that affirmative defense was not recognized until this court's decision in *Hari*, 218 Ill. 2d 275. Thus, it is petitioner's position that, although it was known at the time of his trial that he was taking BuSpar and Desyrel and that these medications could cause serotonin syndrome, this evidence took on "new significance" once the involuntary intoxication affirmative defense was recognized. Therefore, according to petitioner, once this new affirmative defense became available, the evidence that he was taking Buspar and Desyrel and that he was not warned that taking these medications could have caused him to suffer from serotonin syndrome, became the "newly discovered evidence" of his actual innocence. Petitioner further contends that, had he asserted this defense at trial, it is more likely than not that the jury would have found that he was involuntarily intoxicated and, therefore, not legally responsible for committing

_____

[4]As the State observes, this assertion is contrary to the position petitioner took earlier, when he raised claims of ineffective assistance of counsel and actual innocence in a prior successive postconviction petition, alleging that information was available at the time of his trial that the medications he was taking could cause serotonin syndrome. At that time, petitioner argued that the information was evidence of trial counsel's ineffective assistance for failure to seek a fitness hearing and for failure to seek a second degree murder instruction.

first degree murder and aggravated battery with a firearm—the crimes for which he was convicted.

¶ 61        In opposition, the State argues that the trial court's dismissal of petitioner's motion for leave to file a successive postconviction petition should be upheld because petitioner has failed to present any newly discovered evidence of actual innocence. The State argues that, even though the affirmative defense of involuntary intoxication based on unwarned side effects of prescribed medication was first recognized by this court in *Hari*, petitioner still could have argued at his trial that the prescribed medication he was taking caused him to suffer mental status changes that made him unable to understand the criminality of his actions. The State points out that, in *People v. Smith*, 231 Ill. App. 3d 584 (1992), the trial court permitted the defendant to present an involuntary intoxication defense based on the defendant's use of a prescribed high dosage of valium. The *Smith* court noted that several courts in other jurisdictions had held that an involuntary intoxication defense could be based on unwarned side effects from prescribed medication. Thus, the State argues that petitioner is incorrect when he claims that he could not have raised an involuntary intoxication defense at his trial. In addition, the State contends that the lack of precedent for asserting an involuntary intoxication defense should not excuse petitioner's failure to do so.

¶ 62        The State also asks that we reject petitioner's claim that the "newly recognized" affirmative defense of involuntary intoxication based on prescribed medication transforms old evidence into the "newly discovered evidence" of actual innocence necessary for asserting a colorable claim of actual innocence. However, the State also argues that, even if we were to find that a newly available affirmative defense can substitute for "newly discovered evidence" of actual innocence, petitioner failed to show that this evidence, when considered along with all the evidence presented at trial, would probably have led to a different result.

¶ 63        First, we will acknowledge the irregularity of the claim that petitioner has raised. Typically, an actual innocence claim is one in which a postconviction petitioner presents newly discovered evidence persuasively showing that the petitioner did not perform the acts that constitute the crimes for which he was convicted. In other words, it is generally the case that a petitioner seeking leave to file a successive postconviction petition alleging actual innocence brings before the

- 17 -

trial court newly discovered evidence that challenges the physical elements of the charged crimes, that is, the *actus reus.* For example, a petitioner might produce DNA evidence, unavailable at the time of trial, in an attempt to persuasively show that he was not the person who committed the acts or engaged in the conduct that was attributed to him at trial. Or a petitioner might produce affidavits from new witnesses who were unknown or unavailable at the time of trial and who identify someone else as the perpetrator of the crime or can provide reliable evidence that supports the petitioner's alibi defense.

¶ 64     In situations such as these, our caselaw makes clear that the newly discovered evidence, when viewed in the light of all the evidence produced at trial, must be of such conclusive character that it would probably change the result on retrial. If these elements are shown, the petitioner has produced a colorable claim of actual innocence, which entitles him to bring his successive postconviction petition. The trial court must grant the petitioner leave to file, and the matter will then go forward for additional postconviction proceedings.

¶ 65     The case before us does not present a typical actual innocence claim. Here, petitioner does not produce any new evidence to show that he did not commit the "*actus reus*" or physical elements of the offenses of which he was convicted. In fact, petitioner does not now deny, nor has he ever denied, that he performed the acts that resulted in his convictions for first degree murder and aggravated assault. Instead, petitioner is claiming that newly discovered evidence, *i.e.*, evidence that he was involuntarily intoxicated due to the unwarned side effects of prescription medication, persuasively shows that he did not have the requisite *mens rea* when he committed the crimes for which he was convicted. He further claims that, had he presented this newly discovered "evidence," it is more likely than not that the jury would have found that he was involuntarily intoxicated and, as a result, he was not legally responsible for the acts he committed because he did not have the necessary *mens rea*.

¶ 66     This is an unusual claim and appears to be one of first impression. Petitioner has directed this court to no cases from any jurisdiction, nor has this court's research into the matter revealed any such cases, that have held that a newly available defense, which might negate the requisite *mens rea* element for the offenses charged, may provide the basis for a colorable claim of actual innocence, capable

of being brought under the Post-Conviction Hearing Act. However, because the State has not argued that a claim of actual innocence may not be based on evidence that would negate the *mens rea*, for the purposes of this case we will assume that it is theoretically possible for a petitioner to claim actual innocence by challenging either the *actus reus* or the *mens rea* elements. Nevertheless, we find that, in this case, petitioner's claim does not fit within the framework of a freestanding claim of actual innocence.

¶ 67 A freestanding actual innocence claim raised in a successive postconviction petition is an extraordinary remedy. It is a collateral challenge of a conviction based on principles of fundamental fairness and borne out of our constitutional obligation to afford a person who presents new evidence that persuasively indicates that he or she is factually innocent with the additional process necessary to prevent a fundamental miscarriage of justice. Our express reason for allowing a freestanding claim of actual innocence to be cognizable under our Post-Conviction Hearing Act is our firm belief that allowing an innocent person to remain incarcerated would offend all notions of fairness and due process. See W*ashington*, 171 Ill. 2d at 488-89.

¶ 68 Because a successive postconviction claim of actual innocence undermines the finality of a conviction obtained after a fair trial, a postconviction petitioner seeking to file a claim of actual innocence is held to a high standard. The petitioner must produce newly discovered evidence that was unavailable at the time of trial and could not have been discovered employing due diligence. Also, this new evidence must be of such a conclusive character that it persuasively shows that the petitioner is factually innocent of the crimes for which he was convicted and that the evidence, if presented at trial, would exonerate the petitioner.

¶ 69 Based on our assumption that it is theoretically possible for petitioner to set forth a colorable claim of actual innocence in a successive postconviction petition asserting that he lacked the requisite *mens rea*, petitioner would have to produce *newly discovered evidence* that, when considered along with all the evidence presented at trial, would persuasively show that the petitioner lacked the substantial capacity to either appreciate the criminality of his conduct or conform his conduct to the law. Here, petitioner has not met this standard.

¶ 70        A new defense is a new theory; it is not new evidence. Petitioner presents no newly discovered evidence, whether in the form of witness affidavits or other contemporary documentation, that would persuasively show that, at the time of the shootings, he was involuntarily intoxicated and, therefore, lacked the substantial capacity to either appreciate the criminality of his conduct or conform his conduct to the law. The lack of new evidence of involuntary intoxication is particularly striking when considered in the context of the evidence that was offered at trial, including several witnesses who testified that petitioner's behavior just prior to the shootings was unremarkable and that he was oriented as to time, place, and circumstance. And, while it is true that Dr. Chapman testified at petitioner's trial that petitioner lacked the substantial capacity to understand the criminality of his conduct, that testimony was based on petitioner's diagnosed depression, not on petitioner's claim of innocence based on involuntary intoxication. In addition, Dr. Chapman's testimony is not new evidence, and his opinion that petitioner lacked the capacity to appreciate the criminality of his conduct was rejected by the jury.

¶ 71        Petitioner alleges, however, that it was unknown at the time of trial that the medications he was prescribed could cause "serotonin syndrome" and, therefore, his postconviction petition should be allowed to proceed. This argument fails for two reasons. First, petitioner's allegation that the possible effects of his medication were unknown at the time of trial is directly contradicted by the documentation petitioner submitted in support of his actual innocence claim and is also contrary to the position he took when he raised an ineffective assistance claim in earlier filings.

¶ 72        Second, even if we were to accept petitioner's assertion that it was not known at the time of his trial that serotonin syndrome is a possible side effect of the medications he was prescribed, this is not "new evidence" of the sort necessary to make a colorable claim of actual innocence because petitioner has presented no evidence which establishes that he was *actually suffering* from serotonin syndrome when he shot his girlfriend and her mother. To be sure, material referenced in petitioner's postconviction petition does warn that the medications that were prescribed for petitioner—BuSpar and Desyrel—when taken together, *can* cause serotonin syndrome. However, the same material does not say that the medications *always* cause serotonin syndrome. Indeed, the material states that the concomitant use of these two medications should be closely monitored because they (like several other combinations of medication often prescribed for depression) "can *increase*

- 20 -

*the risk* of" serotonin syndrome. Petitioner relies on the mere fact that he was prescribed two medications[5] that *could cause* serotonin syndrome. He presents no new evidence that would tend to show that he was, in fact, suffering from serotonin syndrome.

¶ 73     Accordingly, we find that the information provided by petitioner does not constitute new evidence that persuasively demonstrates that petitioner was suffering from serotonin syndrome at the time the offenses occurred and, as a result, he lacked the substantial capacity to either appreciate the criminality of his conduct or conform his conduct to the law.

¶ 74                                         CONCLUSION

¶ 75     We conclude that petitioner has failed to present a colorable claim of actual innocence because he presented no newly discovered evidence that persuasively shows that, at the time he committed the offenses for which he was convicted, he was involuntarily intoxicated due to the unwarned side effects of prescription medication and, therefore, was unable to conduct himself in accordance with the law. Accordingly, it was not error for the trial court to deny petitioner leave to file his second successive postconviction petition.

¶ 76     Affirmed.

¶ 77     JUSTICE CARTER took no part in the consideration or decision of this case.

---

[5]It was noted in the background section that petitioner told Chief Bernabei that he filled the prescription Dr. Brady gave him and took some of the medication, though he did not take the medicine as prescribed because one of the medicines bothered his stomach. Thus, petitioner has not even clearly established that he was taking these medications when he shot Wolf and Frasco.