2021 IL App (1st) 190594-U

FIFTH DIVISION
December 17, 2021

No. 1-19-0594

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the |
| Respondent-Appellee, | ) | Circuit Court of Cook County. |
| | ) | |
| v. | ) | 99 CR 14723 |
| | ) | |
| VOLNEY MCGHEE, | ) | Alfredo Maldonado, |
| | ) | Judge Presiding. |
| Petitioner-Appellant. | ) | |

JUSTICE CONNORS delivered the judgment of the court.
Justices Hoffman and Cunningham concurred in the judgment.

**ORDER**

¶ 1    *Held:* Evidence of an expert's affidavit concerning the reliability of eyewitness identification following the supreme court's decision in *People v. Lerma*, 2016 IL 118496, when considered along with the other evidence, was not so conclusive to probably change the result on retrial; defendant could not establish prejudice for his claim that trial counsel was ineffective for failing to call an expert witness on the reliability of eyewitness identification; affirmed.

¶ 2    Petitioner, Volney McGhee, appeals from the circuit court's denial of his motion for leave to file a successive postconviction petition under the Post-Conviction Hearing Act (the Act) (725 ILCS 5/122-1 *et seq.*) (West 2018)). On appeal, McGhee argues the circuit court should have granted him leave to file his successive postconviction petition because *People v.*

*Lerma*, 2016 IL 118496, which was issued after his initial postconviction petition proceedings were completed, provided cause for reasserting his claim that trial counsel was ineffective for not seeking an expert witness on the reliability of eyewitness identifications. He contends prejudice existed because his case was based entirely on flawed eyewitness identifications. In McGhee's supplemental brief, he asserts his petition stated a colorable claim of actual innocence based on new evidence in the form of the report from his expert witness on the reliability of eyewitness identification. For the following reasons, we affirm the circuit court's denial of leave to file a successive postconviction petition.

¶ 3                                  I. BACKGROUND

¶ 4        In 1999, McGhee was charged with first-degree murder (720 ILCS 5/9-1(a)(1), (2)) (West 1998)), attempted murder (720 ILCS 5/8-4) (West 1998)) (720 ILCS 5/9-1) (West 1998)), and aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 1998)) in connection with the shooting death of Melvin Thornton. In 2002, following a jury trial, McGhee was convicted of the first-degree murder of Thornton, the attempted murder of Michael Hopson, and aggravated discharge of a firearm. The court subsequently sentenced McGhee to concurrent prison terms of 40 years for first-degree murder and 30 years for attempted murder.

¶ 5                                       A. Trial

¶ 6        At McGhee's 2002 jury trial, Michael Hopson, who had three felony convictions for possession of a controlled substance, testified as follows. On March 18, 1999, at about 10:30 p.m., he picked up Thornton in his white Ford Taurus and they went to a club in Bellwood, Illinois, where they stayed for about 45 minutes. When Hopson was leaving the club, he saw a woman named Crystal, whom he knew from a mutual friend, and two other women.[1] The women

---

[1] Crystal's last name is not included in the report of proceedings

followed Hopson and Thornton in their car. Hopson stopped at Thornton's girlfriend's house to pick up marijuana, after which they drove to a gas station on Washington Boulevard and Pulaski Road to buy cigars for the marijuana. The gas station had a booth where customers paid at a window, and Hopson parked his car alongside the booth. Thornton got of the car and waited in line at the window to pay.

¶ 7        While Hopson was waiting in the car, he saw a red Oldsmobile drive by the gas station heading south on Pulaski. There were three people inside the car, and they were all looking at Hopson. Hopson recognized McGhee, whom he identified in court, as the person sitting in the back seat. McGhee was "half hanging out the window" such that most of his face was outside the window. He was looking in Hopson's direction. Asked where Hopson had seen McGhee before, Hopson responded "[n]umerous places," including in Maywood. He would see McGhee "[r]iding, gas stations, anywhere, you know, just on the street." Hopson testified that "[w]e didn't hang out like that, we didn't kick it like that. So I seen him. It was go, see him go. I never stopped to talk like that." Asked "for how long had you been seeing [McGhee]," he responded, "It's been awhile." He testified that, before the incident happened, he had seen him since "about '97 maybe" and could not recall the time when he first saw him, adding that it had been a few years. Hopson had previously seen McGhee in a red Oldsmobile Cutlass. Hopson testified that McGhee had "some bad feelings" toward Hopson.

¶ 8        When the red Oldsmobile reached Madison Street, Hopson lost sight of it and a few seconds later, he saw it coming from the opposite direction. He recognized the person in the front passenger seat as "Little Tony," whom he had previously seen with McGhee about two or three times at a barber shop in Maywood. Hopson turned off his music and started blowing his car horn and yelling at Thornton to get his attention. Thornton did not come and continued waiting

in line at the window to make his purchase. Hopson waited a few more seconds for Thornton and the red Oldsmobile drove to the other side of the gas station. Hopson pulled his car past the pump so he could look around the attendant's booth. McGhee, who was wearing all black, got out of the red Oldsmobile, put his hood on, which did not cover his face, and came towards Hopson. In his right hand, McGhee had a "big handgun" that looked like a .40 caliber weapon. McGhee ran in Hopson's direction and Hopson put his car in reverse as fast as he could. McGhee kept running toward Hopson, raised the gun, and then shot the gun in Hopson's direction. As Hopson was reversing, he heard two gun shots, lost control of his car, and ended up between an alley and a building on Pulaski. After Hopson gained control of his car, McGhee looked at him and nodded his head. McGhee backed up and away from Hopson and, as McGhee turned around, he looked "surprised" that Thornton was standing next to him. Thornton turned around and threw his hands up. McGhee pointed the gun at Thornton's face and shot him. As Thornton fell, McGhee shot him a second time and fled. Hopson drove away as fast as he could. He called his girlfriend and sister and told them about the shooting.

¶ 9        Hopson did not go to the police right away because there were warrants out for his arrest. When he went to the police station later that afternoon, Hopson told the detectives that he saw McGhee shoot Thornton. He recognized McGhee in a photograph as the person who shot Thornton. Hopson told the detectives that he also saw Little Tony in the red Oldsmobile and identified him in a photograph. On June 3, 1999, Hopson identified McGhee in a lineup as the person who shot Thornton. The State showed Hopson photographs of the red Oldsmobile and he identified it as the car McGhee had been riding in.

¶ 10        Ebonee Pruitt, a former United States Marine, testified that on the night of the shooting, she went to a club in Bellwood, Illinois with her friends, Tiffany and Crystal. Tiffany

and Crystal were too young to get into the club, so Pruitt gave them her car and told them to have fun and pick her up later. At about 10:30 p.m., Pruitt went into the club and had two mixed drinks. At about 1 or 1:30 a.m., Tiffany and Crystal picked Pruitt up from the club. Crystal was driving, Pruitt was in the passenger seat, and Tiffany was in the back seat. Crystal had run into some of her old friends, Thornton and Hopson, and introduced Pruitt to them outside the club. Crystal, Pruitt, and Tiffany then followed Hopson and Thornton, who were driving in a white Taurus, to a gas station at the corner of Washington and Pulaski.

¶ 11        At the gas station, Thornton got out of the car and went to the store. As Pruitt was turning around to talk to Tiffany, she saw a red car pull into the gas station. When Thornton exited his car, Hopson suddenly started backing up. Pruitt heard gunshots. Hopson moved his car to the southern wall of the gas station and continued to back up towards Pulaski. Pruitt saw a man wearing a black hooded sweatshirt with the hood on and black pants come from around the island of the gas station towards Hopson. The man raised a gun and turned it towards Thornton, who was holding his hands up and backing away. The man turned slightly and shot Thornton, who was holding cigars and cigarettes and fell to the ground. The shooter fired a second shot. During the shooting, Crystal backed up the car and the shooter turned around and looked at Pruitt, who saw the shooter's face between the first and second shots. Pruitt had never seen the person before. She identified McGhee in court as the person who shot Thornton.

¶ 12        When Pruitt got home, she made an anonymous call about the shooting. Pruitt did not go to the police until April 20, 1999, because she was scared. On June 3, 1999, she went to the police station and identified McGhee in a lineup as the person who shot Thornton. That same day, she also identified the red car that was in the gas station on the night of the shooting.

¶ 13      Edmond R. Donoghue, a forensic pathologist, described Thornton's two gunshot wounds, including one in the head and one in the thigh. There was no evidence of close range firing because there was no stippling or gunpower particles found on Thornton's body. Donoghue concluded that the gun was fired at least 18 inches away from Thornton. In his opinion, Thornton died of multiple gunshot wounds and the manner of death was homicide.

¶ 14      Chicago police detective Allen Jaglowski testified that on June 3, 1999, Hopson identified McGhee in a lineup as the person who shot Thornton. On the same day, Pruitt identified McGhee in a lineup as the person who shot Thornton. Chicago police officer Gana[2] testified that on June 2, 1999, he went to the address where McGhee's family lived and found a red 1995 Oldsmobile Cutlass parked in front of the house. After Officer Gana knocked on the door, McGhee appeared and identified himself. The Oldsmobile was towed. In court, Officer Gana identified a photograph of the car and testified it was registered to McGhee and his grandfather.

¶ 15      Chicago police sergeant Donald Wolverton testified that he and his partner, Chicago police detective Michael Hughes, went to the gas station at about 3 a.m. after the shooting. He testified that the station was well lit and the lighting conditions were "very good." He saw a pool of blood next to some cigars and five spent .40-caliber cartridge casings. About 15 feet from the casings, he saw one live round .40-caliber bullet. Later that afternoon, at the police station, Hopson described the people and the vehicle who were involved in the shooting. Hopson identified McGhee in a photograph array as the person who shot Thornton. In another photograph array, Hopson identified "Little Tony."

_____

[2] Officer Gana's first name is not included in the record.

¶ 16    Chicago police officer Kostecki,[3] a forensic investigator, testified that the crime scene included a pool of blood within a few feet from some cigars. There were five expended .40-caliber cartridge casings and an unfired .40-caliber bullet within about 10 feet from the pool of blood. He testified that the gas station was well lit. Forensic scientist James Snaidauf testified that he examined the five recovered expended cartridge casings and the one live cartridge for latent fingerprints and did not find any latent prints suitable for comparison. Forensic scientist Tonia Brubaker testified that the five recovered cartridge casings and unfired bullet were all .40-caliber Smith and Wesson cases. The five cartridge casings were fired from the same firearm.

¶ 17    The court entered a stipulation between the parties that Hopson had three prior felony convictions for possession of a controlled substance. The court also entered a certified record from the Secretary of State showing that a 1995 Oldsmobile Cutlass was registered to McGhee and his grandfather.[4]

¶ 18    Testifying for McGhee, Laura Higgs testified that McGhee married her granddaughter, Kia, and Higgs had known McGhee for nine years. Higgs could not remember Kia's full name. On March 18, 1999, McGhee arrived at Higgs's house at about 11:30 p.m. and stayed there all night. Higgs remembered him being there because he was drunk and she had never seen him like that before. At 1 a.m., Higgs saw McGhee in the bedroom.

¶ 19    Following closing arguments and sometime after the jury started to deliberate, the jury asked to review Pruitt's testimony. Ultimately, the jury found McGhee guilty of the first-

---

[3] Officer's Kostecki's first name is not included in the record.
[4] The report of proceedings states that trial court entered into evidence "certified Secretary of State records for 1995, Oldsmobile Cutlass***showing the registered owners of that vehicle to Boley Bradford and Boley McGhee." The Secretary of State records are not included in the record on appeal. The State's brief states that the State "admitted Secretary of State records showing that the 1995 red Oldsmobile Cutlass recovered from petitioner's home was registered to petitioner and his grandfather." Defendant does not dispute this fact.

7

degree murder of Thornton, the attempted murder of Hopson, and aggravated discharge of a firearm. The circuit court denied McGhee's motion for a new trial and subsequently sentenced him to 40 years in prison for first-degree murder and 30 years in prison for attempted murder, to be served concurrently.

¶ 20                                B. Direct Appeal

¶ 21         On direct appeal, McGhee contended that the State failed to prove him guilty beyond a reasonable doubt due to conflicting testimony from two eyewitnesses. He also asserted that he received ineffective assistance of trial counsel and was denied a fair trial due to prosecutorial misconduct during closing argument. We affirmed McGhee's convictions and sentences. See *People v. McGhee*, No. 1-03-0761 (Sept. 28, 2004) (unpublished order under Illinois Supreme Court Rule 23).

¶ 22                            C. Postconviction Petition

¶ 23         McGhee filed his first postconviction petition in 2005, raising, *inter alia*, claims based on ineffective assistance of trial and appellate counsels. The court appointed counsel, after which McGhee filed an amended postconviction petition, asserting, *inter alia,* that trial counsel was ineffective for failing to call an eyewitness identification expert to cast doubt on Pruitt's ability to identify the shooter. He asserted that Pruitt was the State's "star witness" and testimony of an eyewitness expert, Professor G. Loftus, would have allowed the jury to assess her testimony in its proper light, and in turn, the testimony would have been given less weight. McGhee stated the expert testimony would have explained many points that affected Pruitt's ability to perceive and recall her viewing of the shooter, including weapon focus and concern for her own safety, the "change blindness" phenomenon, and the effect of stress on perception. McGhee asserted that the jury did not likely rely only on Hopson's purported identification

because it had asked for the transcript of Pruitt's testimony. He stated that Pruitt would have appeared to be much more credible and unbiased than Hopson, who had prior felony convictions. McGhee contended that the jury most likely placed considerable weight on Pruitt's identification testimony, her testimony was almost certainly unreliable, and the jury was not given the tools to assess it properly.

¶ 24    Attached to McGhee's petition was an affidavit from Geoffrey R. Loftus, Ph.D., dated May 18, 2009. Loftus understood "that Mr. Hopson's identification of Mr. McGhee and his testimony to that effect is impeached for reasons other than his identification of Mr. McGhee. For that reason, I will focus my remarks on perception and memory primarily as they pertain to Ms. Pruitt." According to Loftus, "[t]he central issue discussed by an eyewitness expert is that, contrary to common sense, a confident witness need not be an accurate witness." He averred that if called, he would have testified about the factors relevant to eyewitness perception and eyewitness memory, including a general theory of perception and memory. Loftus would also have testified about scientific evidence concerning circumstances under which memory fails and the consequences of such memory failure for eyewitness testimony, effects of attention, effects of duration, effects of alcohol, effects of stress, lineup procedures, the nature of suggestive post-event information, and the circumstances under which the confidence with which a witness recounts a memory can and cannot be appropriately used as an index of the memory's accuracy.

¶ 25    The State filed a motion to dismiss McGhee's postconviction petition, which the court granted after a hearing. On appeal from the dismissal, McGhee asserted, *inter alia*, that his trial counsel was ineffective for failing to present expert testimony on the reliability of eyewitness identifications.

¶ 26    We affirmed the circuit court's dismissal. We concluded that it was not unreasonable for defense counsel not to present expert testimony on the reliability of eyewitness identifications. *McGhee*, 2012 IL App (1st) 093494, ¶ 55. In doing so, we stated that the current law in Illinois was clear that "trial counsel had broad leeway in deciding whether to call a particular witness or to pursue a given strategy" and "our supreme court has at least twice previously considered and rejected arguments along these lines." *Id.* ¶ 54 (citing *People v. Enis*, 139 Ill. 2d 264, 285-91 (1990) (direct appeal) and *People v. Enis*, 194 Ill. 2d 361, 391-93 (2000) (appeal on postconviction)). We noted that the trend in Illinois was to preclude expert testimony on the reliability of eyewitness identification because it invaded the province of the jury as the trier of fact. *Id.* We also stated that "[w]e are unaware of, and [McGhee] has not offered, any Illinois cases in which an attorney has been deemed ineffective for failing to offer, or a trial court has been found to have abused its discretion for refusing to allow, expert testimony on this subject." *Id.* ¶ 55.

¶ 27                    D. Successive Postconviction Petition

¶ 28    In 2018, McGhee filed the *pro se* motion for leave to file a successive postconviction petition that is at issue here. He raised a claim of actual innocence based on the supreme court's decision in *Lerma*, 2016 IL 118496, regarding expert testimony on the reliability of eyewitness identifications. In *Lerma*, the supreme court stated that since its previous decision in *Enis*, there had been a "dramatic shift in the legal landscape, as expert testimony concerning the reliability of eyewitness testimony has moved from novel and uncertain to settled and widely accepted" and that the "research is well settled, well supported, and in appropriate cases a perfectly proper subject for expert testimony." *Id.* ¶ 24. McGhee asserted that the *Lerma* decision was considered newly discovered evidence for his claim. He claimed that the State's case depended on the

reliability of eyewitness identifications, which was the only evidence against him. McGhee also contended that trial counsel was ineffective for failing to present an expert witness on eyewitness identifications. McGhee attached to his petition the same May 2009 affidavit from Loftus that he had attached to his initial petition.

¶ 29                                                E. Circuit Court's Order on
Motion for Leave to File Successive Post-Conviction Petition

¶ 30        The circuit court denied McGhee's motion for leave to file a successive post-conviction petition. In the court's written order, it stated that "although McGhee labels his claim actual innocence, it plainly cannot be" and "[h]e offers no newly discovered evidence." The court stated that Loftus's affidavit was also attached to McGhee's initial petition.

¶ 31        The court further stated that McGhee's claim was subject to the cause-and-prejudice test and did not relate to actual innocence, noting that his claim did not offer reliable evidence showing that the State convicted the wrong person, but rather challenged the strength of the evidence that was presented against him and stated his trial counsel was ineffective for failing to retain expert testimony on eyewitness identifications. The court stated that the issue of whether McGhee's counsel was ineffective for failing to present expert testimony on eyewitness identifications had already been raised and decided. The court concluded that *Lerma* did not relax *res judicata* or provide cause for McGhee to bring a successive petition. The court also found that *Lerma* did not apply retroactively on collateral review because it did not narrow the scope of a criminal statute or place conduct or persons beyond the state's power to punish. It stated that the *Lerma* rule was that expert testimony on eyewitness identifications should be permitted in "appropriate" cases and was a procedural rule, not a "watershed rule" implicating the fundamental fairness and accuracy of a criminal proceeding.

¶ 32      The court further noted that even if *Lerma* applied retroactively, McGhee could not establish ineffective assistance of counsel for failure to present expert testimony on eyewitness identifications. The court stated that McGhee's conviction did not entirely rest on unreliable identification testimony and Loftus's affidavit only addressed Pruitt's identification. The court stated that given that *Lerma* was decided 14 years after McGhee's trial, it was not objectively unreasonable for counsel not to present expert testimony on eyewitness identifications. The court found that McGhee could not establish prejudice because he could not show that counsel's performance was deficient or that the result of his trial could have been different.

¶ 33      McGhee now appeals from the court's denial of his motion for leave to file a successive postconviction petition.

¶ 34                                II. ANALYSIS

¶ 35      On appeal, McGhee initially contends that the circuit court should have granted him leave to file his *pro se* successive postconviction petition because *Lerma*, 2016 IL 118496, which was decided after his initial postconviction petition proceedings concluded, provides cause for asserting his claim that trial counsel was ineffective for not seeking an expert witness on the reliability of eyewitness identifications. He asserts that the supreme court in *Lerma* stated that "there has been a dramatic shift in the legal landscape, as expert testimony concerning the reliability of eyewitness testimony has moved from novel and uncertain to settled and widely accepted" and that the court acknowledged that "now there are widely accepted scientific findings about the fallibility of eyewitness identification and the reasons behind such errors." He contends that prejudice exists because the case was based entirely on flawed eyewitness identifications and expert testimony on eyewitness fallibility could have changed the outcome of the trial.

¶ 36                                    *People v. Lerma*, 2016 IL 118496

¶ 37        We briefly summarize *Lerma*. There, the supreme court decided whether, in light of the specific facts and circumstances of the case, the circuit court abused its discretion when it denied the defendant's motion to allow expert testimony regarding the reliability of eyewitness identifications. *Lerma,* 2016 IL 118596, ¶ 2. The supreme court stated that the last time the court had addressed the admission of eyewitness expert testimony was in *People v. Enis*, 139 Ill. 2d 264, 289 (1990), in which the court expressed caution and skepticism against the overuse of such testimony, but that since *Enis*, there had been a "dramatic shift in the legal landscape, as expert testimony concerning the reliability of eyewitness testimony has moved from novel and uncertain to settled and widely accepted." *Id.* ¶ 24. The supreme court stated that since that time, "eyewitness identifications are not always as reliable as they appear, but we have also learned, from a scientific standpoint, why this is often the case." *Id.* It noted that "[w]hereas *Enis* allowed for expressed caution toward the developing research concerning eyewitness identifications, today we are able to recognize that such research is well settled, well supported, and in appropriate cases a perfectly proper subject for expert testimony." *Id.*

¶ 38        The supreme court further stated that *Lerma* was the type of case for which expert eyewitness testimony was both relevant and appropriate. *Id.* ¶ 26. The court noted that the only evidence of the defendant's guilt was the eyewitness identifications of two witnesses, only one of which was subject to adversarial testing and cross-examination at trial, and there was no physical evidence tying the defendant to the offense. *Id.* The victim, Gill, and his friend, Clark, were sitting on a porch when a shooter approached and opened fire, hitting Gill several times. *Id.* ¶ 5. After Clark brought Gill inside, Gill said that the defendant was the shooter. *Id.* Gill died before trial and his statement was admitted into evidence as an excited utterance. *Id.* ¶ 26. Clark

identified the defendant the day after the shooting at the police station. *Id.* ¶ 6. Although Clark testified she had seen the defendant across the street about 10 times before the shooting, she testified she "did not know him" and the court noted she was unequivocal that she did not know the defendant before the shooting. *Id.* ¶¶ 26, 31.

¶ 39    The court in *Lerma* found that under those facts expert eyewitness testimony would be probative and admissible. *Id.* ¶ 26. The court stated that the circuit court abused its discretion when it denied the defendant's request to present testimony from an expert, noting that the court did so for reasons that were expressly contradicted by the expert's report and inconsistent with the actual facts of the case. *Id.* ¶ 32. The court discussed certain factors that courts should consider when determining the relevance of expert testimony on eyewitness identifications, including the importance of the eyewitness identification to the State's case, the presence or absence of the factors identified by the expert as undermining the credibility of eyewitness identifications, whether the witness was subject to adversarial testing and cross-examination at trial, and the witnesses' prior familiarity with the defendant. *Id.* ¶ 26. In *People v. Brown,* 2020 IL App (1st) 190828, ¶ 52, this court explained that *Lerma* "reaffirmed the long standing rule that admission of expert testimony is within the trial court's discretion and shall not be overturned on review absent an abuse of discretion."

¶ 40                                    Supplemental Briefing

¶ 41    After the parties completed their initial briefing, we granted McGhee's motion to file a supplemental brief based on *People v. Martinez*, 2021 IL App (1st) 190490, which was issued after McGhee filed his reply brief. In *Martinez*, a division of this court rejected the State's argument there that *Lerma* did not apply retroactively for an actual innocence claim, noting that the court must apply the rule prospectively and "evaluate how a trier of fact might assess new

evidence now, not whether the court erred in the past," and concluding that a report from Loftus in that case was newly discovered evidence. *Id.* ¶¶ 111, 113. We allowed both parties to submit supplemental briefs.

¶ 42    In McGhee's supplemental brief, he contends he set forth a claim of actual innocence in his petition. He contends that under *Martinez*, when Loftus's report is considered in light of *Lerma*, it is newly discovered evidence. He asserts that even though he had Loftus's report in 2009 when he filed his initial petition, the significance of the report was unavailable to him until the *Lerma* decision was issued in 2016. He argues that Loftus's report is material because it speaks directly to the issue of whether Pruitt's identification is reliable and trustworthy and that it is not cumulative to any evidence offered at trial. He argues that Loftus's report casts doubt on Pruitt's eyewitness identification of him and would likely change the result at retrial. McGhee claims that the report places the evidence in a different light and undermines the court's confidence in the judgment of guilt against him.

¶ 43                    Post-Conviction Hearing Act

¶ 44    The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq*.) (West 2018)) provides a method by which a defendant can assert that his conviction was the result of a substantial denial of his constitutional rights. *People v. Hodges*, 234 Ill. 2d 1, 9 (2009). The Act is not a substitute for an appeal but is a collateral attack on a final judgment. *People v. Jones*, 2017 IL App (1st) 123371, ¶ 40. When a defendant has previously taken an appeal from a judgment of conviction, as here, the judgment of the reviewing court will bar review under the doctrine of *res judicata* of all issues actually decided by the reviewing court and any other claims that could have been presented to the reviewing court will be deemed forfeited. *People v. McCoy*, 2020 IL App (1st) 161199, ¶ 14. The Act provides that any claim of substantial denial of

constitutional rights not raised in the original or amended petition is subject to the doctrines of *res judicata* and forfeiture. *Jones*, 2017 IL App (1st) 123371, ¶ 41.

¶ 45        "The Act contemplates the filing of a single petition." *McCoy*, 2020 IL App (1st) 161199, ¶ 15. Successive postconviction petitions under the Act are disfavored. *People v. Edwards*, 2012 IL 111711, ¶ 29. However, there are two exceptions where "fundamental fairness" compels that the bar against successive petitions be lifted. *People v. Taliani*, 2021 IL 125891, ¶ 55. The first exception for relaxing the bar is when a defendant can establish cause and prejudice under section 122-1(f) of the Act (725 ILCS 5/122-1(f) (West 2018)) for failing to raise the claim earlier. *Edwards*, 2012 IL 111711, ¶ 22. The second exception is when the defendant asserts a fundamental miscarriage of justice based on actual innocence. *People v. Robinson*, 2020 IL 123849, ¶ 42. A defendant seeking to file a successive postconviction proceeding must first obtain leave of court. *People v. Tidwell*, 236 Ill. 2d 150, 157 (2010). "[L]eave of court should be granted where the petitioner's supporting documentation raises the probability that it is more likely than not that no reasonable juror would have convicted the petitioner in light of the new evidence." *Robinson*, 2020 IL 123849, ¶ 44. A request to file a successive petition based on actual innocence and cause and prejudice is reviewed under a higher standard than that applicable to the first stage for an initial petition, which only requires that the petition is not frivolous or patently without merit. *Id.* ¶ 43; *People v. Smith*, 2014 IL 115946, ¶ 35. We review *de novo* the trial court's decision to deny leave to file a successive petition, accepting all well-pled facts and affidavits as true. *People v. Johnson*, 2020 IL App (1st) 171362, ¶ 10.

¶ 46                    McGhee's Actual Innocence Claim

¶ 47    We first address McGhee's assertion in his supplemental brief that his successive postconviction petition makes a claim of actual innocence. "A freestanding actual innocence claim raised in a successive postconviction petition is an extraordinary remedy." *Taliani*, 2021 IL 125891, ¶ 67. Our supreme court has stated that an actual innocence claim "is a collateral challenge of a conviction based on principles of fundamental fairness and borne out of our constitutional obligation to afford a person who presents new evidence that persuasively indicates that he or she is factually innocent with the additional process necessary to prevent a fundamental miscarriage of justice." *Id.*

¶ 48    "Because a successive postconviction claim of actual innocence undermines the finality of a conviction obtained after a fair trial, a postconviction petitioner seeking to file a claim of actual innocence is held to a high standard." *Id.* ¶ 68. To assert a claim based on actual innocence, the supporting evidence must be newly discovered, material and not merely cumulative, and of such conclusive character that it would probably change the result on retrial. *Edwards*, 2012 IL 111711, ¶ 32. Newly discovered evidence means the evidence was discovered after trial and could not have been discovered earlier through the exercise of due diligence. *Robinson*, 2020 IL 123849, ¶ 47. "Material means the evidence is relevant and probative of the petitioner's innocence." *People v. Coleman*, 2013 IL 113307, ¶ 96. Noncumulative means the evidence adds to the information that the fact finder heard at trial. *Robinson*, 2020 IL 123849, ¶ 47. Conclusive means the evidence, when considered along with the trial evidence, would probably lead to a different result. *Coleman*, 2013 IL 113307, ¶ 96. "The conclusive character of the new evidence is the most important element of an actual innocence claim." *Robinson*, 2020 IL 123849, ¶ 47. The "new evidence must be of such a conclusive character that it persuasively shows that the petitioner is factually innocent of the crimes for which he was convicted and that

the evidence, if presented at trial, would exonerate the petitioner." *Taliani*, 2021 IL 125891, ¶ 68. In addition, our supreme court has stated that a " 'free standing' claim of actual innocence is one in which newly discovered evidence makes a persuasive showing that the petitioner did not commit the charged offense and was, therefore, wrongfully convicted." *Id.* ¶ 56.

¶ 49 Further, in *People v. Hobley*, our supreme court stated that "[a] 'free-standing' claim of innocence means that the newly discovered evidence being relied upon 'is not being used to supplement an assertion of a constitutional violation with respect to [the] trial.' " 182 Ill. 2d 404, 443-44 (quoting *People v. Washington*, 171 Ill. 2d 475, 477-78 (1996)). Here, McGhee is improperly using the same affidavit from Loftus to supplement his ineffective assistance of counsel claim and support his actual innocence claim. *See People v. Gonzalez*, 2016 IL App (1st) 141660, ¶ 30 (the defendant could not use newly discovered evidence of a detective's pattern and practice of framing suspects by orchestrating false identification evidence to supplement his assertation that the State committed a *Brady* violation and support his claim of actual innocence, and his actual innocence claim failed).

¶ 50 We acknowledge that in *People v. Martinez,* 2021 IL App (1st) 190490, a division of this court concluded that *Hobley* was "inconsistent with the Illinois Supreme Court's more recent pronouncements on actual innocence." *Id.* ¶ 104. McGhee asserts we should follow the analysis in *Martinez*. However, *Martinez* is distinguishable.

¶ 51 In *Martinez*, the court stated that our supreme court in *People v. Coleman*, 2013 IL 113307, explained that "a freestanding actual innocence claim contemplates that the *claims* be independent, not that the actual innocence claim be independent of *the evidence* underlying his other constitutional claim or trial error." (Emphasis in original.) *Id.* ¶ 104. The court in *Martinez* stated that *Hobley* effectively imposed a fifth requirement for an actual innocence claim: the

18

evidence underlying the actual innocence claim could not be used to support any other constitutional claim. *Id.* ¶ 105. The court concluded that "*Hobley's* fifth requirement for raising an actual innocence claim cannot be reconciled with our supreme court's more recent postconviction jurisprudence." *Id.* ¶ 106. However, *Martinez* nevertheless concluded that even if *Hobley's* rule remained good law, *Hobley* did not preclude the McGhee's claim because his actual innocence claim relied on evidence in addition to the evidence underlying his due process claim. *Id.* ¶ 106. Here, unlike *Martinez*, McGhee relies on the same Loftus affidavit to supplement his ineffective assistance of counsel claim and support his actual innocence claim.

¶ 52       Moreover, in *Martinez*, the court stated: "Arguably, the *Hobley* rule may serve a purpose where a defendant seeking leave to file a successive postconviction petition asserts actual innocence to circumvent the cause-and-prejudice test that applies when determining whether a defendant is entitled to leave to file a successive petition." *Id.* ¶ 103. The court noted that the defendant's case and *Hobley* both took place at the second stage of proceedings. *Id.* Here, McGhee's case is at a different procedural posture, as we are reviewing the circuit court's order that denied him leave to file his successive postconviction petition. *Martinez* is distinguishable and we are unpersuaded by McGhee's reliance on it as it relates to *Hobley* and his actual innocence claim.

¶ 53       Nevertheless, even if the *Hobley* rule did not apply, and even assuming that the Loftus affidavit is noncumulative, newly discovered, and material evidence, McGhee's actual innocence claim would still fail. The Loftus affidavit and evidence contained therein is not of such a conclusive character that Loftus's testimony on the reliability of eyewitness identifications, when considered along with the trial evidence, would probably lead to a different result. See *Robinson*, 2020 IL 123849, ¶ 47 ("the conclusive character element refers to evidence

that, when considered along with the trial evidence, would probably lead to a different result" and "[t]he conclusive character of the new evidence is the most important element of an actual innocence claim").

¶ 54        Here, the Loftus affidavit addresses only Pruitt's testimony, as Loftus stated in his affidavit that he focused his "remarks on perception and memory primarily as they pertain to [Pruitt]." McGhee asserts on appeal that the affidavit detailed "numerous factors that may have affected the reliability of [Pruitt's] identification" and the testimony from an expert on the reliability and fallibility of eyewitness identifications would have a profound impact on the weight assigned" to Pruitt's identification and on the outcome of the trial. However, Pruitt was not the only identification witness, nor was she the State's key witness or strongest piece of evidence against McGhee. Rather, the State presented evidence of another identification witness—Hopson, who testified that he knew McGhee before the shooting and identified McGhee as the shooter the afternoon after the shooting and at trial. Specifically, Hopson testified that before the shooting, he had seen McGhee at "numerous places" around the Maywood area, including "[r]iding, gas stations, anywhere, you know, just on the street." He also recognized the person in the front passenger seat as "Little Tony" and testified that he had previously seen him with McGhee about two to three times at a barber shop in Maywood. Hopson also testified that when the red car first drove past him, McGhee was "half hanging out the window" such that most of his face was outside the window and he was looking in Hopson's direction. He testified McGhee was wearing all black and that McGhee's hood did not cover his face. Hopson identified McGhee in a photograph as the person who shot Thornton. See *People v. Donahue,* 2014 IL App (1st) 120163, ¶ 95 (concluding that 11 days between the offense and the initial identification was a short time).

¶ 55    Moreover, in addition to Hopson's identification testimony, the State presented evidence that linked McGhee's car to the scene of the shooting and corroborated the witnesses' testimony. Hopson testified that on the night of the shooting, McGhee was in a red Oldsmobile at the gas station and that he had previously seen McGhee in the red Oldsmobile. Pruitt testified that she saw a red car pull into the gas station before the shooting and both Hopson and Pruitt identified photographs of the car they saw that night. Further, the State presented evidence that a red Oldsmobile was recovered from McGhee's home and was registered to McGhee and his grandfather. Both Hopson and Pruitt were subject to adversarial testing and cross-examination.

¶ 56    In addition, as previously discussed, for an actual innocence claim, our supreme court has stated that the "new evidence must be of such a conclusive character that it persuasively shows that the petitioner is factually innocent of the crimes for which he was convicted and that the evidence, if presented at trial, would exonerate the petitioner." *Taliani*, 2021 IL 125891, ¶ 68. It is well-established that "to set forth a colorable claim of actual innocence in a successive postconviction petition, the petitioner must produce *newly discovered evidence* that, when considered along with all the evidence presented at trial, would probably lead to a different result on retrial." (Emphasis in original.) *Id.* ¶ 59. In *Brown*, 2020 IL App (1st) 190828, ¶¶ 70-71, an appeal from the third stage of proceedings, the court concluded after considering all the evidence that the defendant did not establish his actual innocence claim, noting that the expert testimony on eyewitness identification served to impeach and undermine the credibility of the State's witnesses, but did not exonerate the defendant by affirmatively demonstrating that he was not the shooter. Here, after considering the evidence as a whole, we find that although the Loftus affidavit attempts to undermine Pruitt's credibility, it does not exonerate McGhee by demonstrating that he was not the shooter.

21

¶ 57    We disagree with McGhee's assertion that the facts of *Martinez,* 2021 IL App (1st) 190490, are similar to this case. In *Martinez*, the trial court found that the strongest piece of evidence against the defendant was the identification of the State's eyewitness, Parker. *Id*. ¶ 116. At trial, Parker provided certain details that conflicted with her written statement "or was otherwise unable to recall details" and in those instances she repeated that her memory was better at the time she made her statement. *Id.* ¶¶ 17, 20-21. In her written statement, she had explicitly identified the defendant as the person who punched the victim during the offense, but testified at trial that she did not remember telling the police that. *Id.* In the defendant's successive postconviction petition, he presented newly discovered evidence that Parker's written statement was false and that Detective Guevara, the detective to whom Parker gave her written statement, had engaged in misconduct in the case. *Id.* ¶¶ 49, 69, 73-74, 82. Further, the defendant gave an uncorroborated written statement after the offense, which he disavowed at trial, and he testified that before he gave his statement, Guevara and another detective had aggressively questioned and yelled at him, and he had been in a windowless room for two days without sufficient food or drink. *Id.* ¶¶ 32-36, 83-84. Defendant asserted that his due process rights were violated when Guevara steered witnesses to identify him and, with the assistance of another detective, engaged in trickery to get him to sign a statement. *Id.* ¶ 60. The court found that the defendant made a substantial showing that his conviction rested on false evidence procured by police misconduct. *Id.* ¶ 85. With respect to the defendant's actual innocence claim, he relied on a report from Loftus regarding the reliability of eyewitness identification. *Id.* ¶ 106. The court found that the defendant made a substantial showing of actual innocence, noting that Parker was the strongest piece of evidence, which the trial court gave more weight than the defendant's written statement. *Id*. ¶ 116. Also, Loftus's testimony would undermine Parker's potential ability to see the scene of

the attack and Parker's inability to see the defendant commit the offense would strengthen her recent assertion that her pretrial statement was false. *Id.* ¶ 116.

¶ 58     Here, unlike *Martinez*, there is no evidence of police misconduct, that Pruitt's pretrial statement regarding her identification was coerced or that she recanted it, or that her pretrial statement conflicted with her trial testimony. Further, unlike the witness in *Martinez*, Pruitt was not the State's strongest piece of evidence. As previously discussed, the State presented evidence of another eyewitness, Hopson, who testified he knew McGhee before the offense and identified him after the shooting and at trial. Further, in *Martinez*, the court noted that the defendant's actual innocence claim "relies on evidence in addition to that underlying his claims based on police misconduct and *Brady*. Specifically, defendant relies on the report of Dr. Loftus." *Id.* ¶ 106. Here, the only evidence supporting McGhee's actual innocence claim is the Loftus affidavit. Accordingly, *Martinez* is distinguishable.

¶ 59     Further, we disagree with McGhee's assertion that because the jury requested a copy of Pruitt's testimony to review during deliberations and not Hopson's, the jury placed a greater weight on Pruitt's identification and relied primarily on her testimony to convict him. We will not attempt to speculate with the reasoning behind a jury's question during deliberations. See *People v. Spears*, 112 Ill. 2d 396, 409 (1986) (the court will not "attempt to metaphysically divine a jury's collective intent from a single question that may well have only embodied the curiosity or concern of a single juror."); *People v. Peoples*, 2015 IL App (1st) 121717, ¶ 106 ("We may not guess as to why a jury did what it did, no matter how obvious it may seem to us.").

¶ 60     Overall, considering the Loftus affidavit regarding the reliability of Pruitt's eyewitness identification, along with the trial evidence, the affidavit is not so conclusive that it

would probably lead to a different result on retrial. See *Taliani*, 2021 IL 125891, ¶ 59 ("to set forth a colorable claim of actual innocence in a successive postconviction petition, the petitioner must produce newly discovered evidence that, when considered along with all the evidence presented at trial, would probably lead to a different result on retrial").

¶ 61                                                    Cause and Prejudice

¶ 62       We next consider McGhee's contention that his successive postconviction petition satisfied the cause and prejudice test for his ineffective assistance of counsel claim. Under the Act, to establish cause and prejudice, the petitioner must identify "an objective factor that impeded his or her ability to raise a specific claim during his or her initial post-conviction proceedings." 725 ILCS 5/122-1(f)(1) (West 2018). To establish prejudice, a petitioner must demonstrate that the claim not raised during his or her initial postconviction proceedings so infected the trial that the resulting conviction or sentence violated due process. 725 ILCS 5/122-1(f)(2) (West 2018). "The cause-and-prejudice test establishes a more onerous standard than that at the first pleading stage." *Johnson*, 2020 IL App (1st) 171362, ¶ 11. "It is the defendant's burden to demonstrate both cause and prejudice for each claim raised in his successive petition." *People v. Thompson*, 383 Ill. App. 3d 924, 929 (2008).

¶ 63       Here, even assuming that McGhee established cause, he did not adequately allege prejudice. McGhee's underlying claim is that trial counsel was ineffective for failing to call an expert on the reliability of eyewitness identifications. To establish a claim of ineffective assistance of counsel, a defendant must satisfy a two-prong test set forth in *Strickland v. Washington,* 466 U.S. 668, 687, 694 (1984). A defendant must demonstrate that 1) trial counsel's representation fell below an objective standard of reasonableness and 2) there exists a reasonable probability that, but for counsel's errors, the result of the trial would have been different. *Id.*

¶ 64      Here, McGhee cannot show that there is a reasonable probability that the result of the proceeding would have been different had counsel called Loftus to testify about the reliability of Pruitt's identification testimony. He cannot establish prejudice for the same reasons, discussed above, that he could not establish that the new evidence of the Loftus affidavit was so conclusive that it would probably lead to a different the result on retrial. Therefore, McGhee has not demonstrated that he suffered prejudice from defense counsel's failure to call an expert witness on the reliability of eyewitness identification. McGhee's ineffective assistance of counsel claim fails and he has not satisfied the prejudice part of the cause-and-prejudice test for his successive postconviction petition.

¶ 65      McGhee has failed to set forth an actual innocence claim and has failed to meet the cause-and-prejudice test for his ineffective assistance of counsel claim. Because leave of court to file a successive petition should be denied when it is clear that the claims alleged by the defendant fail as a matter of law, we affirm the circuit court's denial of McGhee's request for leave to file a successive postconviction petition. See *Smith*, 2014 IL 115946, ¶ 35.

¶ 66                                        III. CONCLUSION

¶ 67      For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 68      Affirmed.