2023 IL App (2d) 220297-U
No. 2-22-0297
Order filed July 19, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 10-CF-590 |
| JUAN MACEDO, JR., | ) ) | Honorable Reginald N. Campbell, |
| Defendant-Appellee. | ) | Judge, Presiding. |

JUSTICE HUTCHINSON delivered the judgment of the court.
Justices Birkett and Kennedy concurred in the judgment.

**ORDER**

¶ 1   *Held*: The trial court abused its discretion in disallowing the State from impeaching defendant's codefendant with the factual basis of his guilty plea for attempted murder. The trial court's ruling that defendant established a claim of actual innocence was manifestly erroneous.

¶ 2   Defendant was convicted of three counts of attempted first-degree murder, one count of armed violence, and one count of aggravated discharge of a firearm following a jury trial. He was sentenced to a term of 28 years' imprisonment. Thereafter, defendant filed a petition for post-conviction relief. His claim of actual innocence survived and advanced to a third-stage evidentiary hearing. The trial court vacated defendant's convictions and sentence on August 4, 2022, and

granted defendant's request for a new trial. The State appeals from that order, contending that the trial court's ruling was manifestly erroneous for barring certain impeachment evidence against the testimony of codefendant, Carlos Berrum. Additionally, the State challenges the trial court's finding that Berrum's testimony was of such conclusive character that it would probably change the result on retrial.

¶ 3                         I. BACKGROUND

¶ 4     The following facts and evidence were adduced during defendant's jury trial. Undisputed testimony from the victims and witnesses reflected that on March 5, 2010, the victims, Martin Cortez, Reggie Cortez, and B.C., Martin's minor son, were followed by defendant driving his girlfriend's black Toyota Corolla while Berrum was in the passenger seat. The testimony reflected that defendant was weaving through traffic to catch up to the victims' vehicle. Defendant's vehicle caught up with the victims' vehicle, a silver Chrysler 300, and pulled up next to it at a red light. Martin testified that Berrum stated, "What's up now," and proceeded to pull out a gun and pointed it in Martin's direction. Martin testified that he heard the gun jam as Berrum attempted to fire it. Martin sped away and pulled over in a nearby parking lot. In the parking lot, Martin and Reggie exited their vehicle and yelled out to defendant and Berrum that B.C. was in their car. Defendant's vehicle proceeded to drive away and Martin, thinking the encounter was over, proceeded on his way.

¶ 5     Martin testified that, soon after, he noticed defendant's vehicle in front of his vehicle. Defendant proceeded to brake and then put his vehicle in reverse, causing the two cars to collide. Berrum then fired several shots through Martin's windshield. As Martin attempted to pull away, Berrum fired more shots at Martin's vehicle. Martin returned to his home and called 911. Martin's testimony was corroborated by Reggie and two other witnesses. Martin and Reggie both testified

that they had prior gang affiliations and that defendant and Berrum used to affiliate with a rival gang. Martin averred that he never had a gun that day, and he never saw Reggie Cortez with a gun. He and Reggie never threatened anyone in the Toyota.

¶ 6   Reggie Cortez's testimony of events was largely duplicative of Martin's. Reggie did offer that he had been affiliated with the Latin Kings about three to four years before the day of the incident, but on that day he was affiliated with the rival Maniac Latin Disciples.

¶ 7   Rick Demierre, a detective with the Gang Crimes Unit, testified for the State. He offered a description of the culture of Elgin street gangs. Specifically, Demierre testified that, over the course of his 10–year career, he investigated many gang-related offenses. He testified that the investigations entailed "graffiti, narcotics, weapons, shootings, murders, attempt[ed] murder, aggravated batteries." Demierre further testified that he classified members of gangs by using a list of criteria that included self-admission, an arrest in the presence of a known gang member, the exhibition of gang colors, confidential informants, and being arrested for a criminal offense involving gangs. He testified that defendant and Berrum were known to him and affiliated with the Latin Kings gang. He testified that he knew defendant to be affiliated with a gang based on prior contacts with him. He testified that Martin was affiliated with a rival gang, the Maniac Latin Disciples. He testified that Reggie had switched gang membership; he was formerly a Latin King and had become a Maniac Latin Disciple. He further testified that punishment existed for switching or leaving a gang. That punishment could include murdering the gang member that switched gangs.

¶ 8   Robert Engelke, an evidence technician with the Elgin Police Department, testified that he collected gunshot residue (GSR) kits from defendant, Berrum, Martin Cortez, and Reggie Cortez on the day of the shooting. Engelke testified that Berrum had been alone in a jail cell with a toilet and sink before the GSR test was performed. Engelke noted that Berrum's hands were cold and

moist when he was taken out of the cell for testing. Defendant's GSR sample indicated that he "either discharged a firearm, came in contact with a primer gunshot residue related item, or his left hand was in the environment of a discharged firearm." The remaining tests performed on Berrum, Martin, and Reggie indicated that they may not have discharged a firearm with either hand or, if they did, the particles were removed by activity, not deposited, or not detected by the procedure.

¶ 9 Police photographed and processed the Toyota Corolla that sustained heavy rear-end and passenger side damage. The tire marks left on the street indicated that they were made from a vehicle traveling sideways. The Toyota Corolla appeared that it had been pushed from the passenger side. A .45 caliber shell casing was discovered under the rear seat cushion. Four .45 caliber shell casings were found at the crime scene. Martin's Chrysler 300 had four bullet holes in the front windshield. The rear window was shattered and had a bullet hole in the lower right corner. One bullet hole was made just above the armrest between the two front seats. Three bullet holes were in the rear seat area of the car, very close to the car seat in which B.C. was sitting. Examination of the .45 caliber shell casings showed that all had been fired from the same semiautomatic firearm.

¶ 10 After closing arguments and jury deliberations, the jury found defendant guilty of all five counts charged. The trial court sentenced him to a total of 28 years' imprisonment. Defendant filed a timely motion for judgment notwithstanding the verdict stating, *inter alia*, that defendant met Jessie Orizaba while in custody of the Kane County Sheriff. Defendant alleged that Orizaba told him that he had been in the backseat of the car driven by Martin Cortez on the day of the incident. Orizaba had said that no one in the Toyota Corolla had displayed a gun and Martin rammed his car into the Toyota Corolla as defendant "was simply driving down the street."

¶ 11    A hearing was held on defendant's motion wherein Orizaba testified that he had lied when he gave defendant's attorney his statement that he was in Martin's vehicle. He testified that he and defendant were in rival gangs and his statement was "trying to show good faith" by "just trying to help out another inmate if I could[.]" Defendant's motion for judgment notwithstanding the verdict was denied.

¶ 12    This court affirmed defendant's conviction on direct appeal. See *People v. Macedo*, 2014 IL App (2d) 121079-U. On August 11, 2015, defendant filed a pro se petition for post-conviction relief. The matter was advanced to second stage and defendant was appointed counsel who filed a second amended petition on July 28, 2022. Of the ten claims raised, only defendant's claim of actual innocence advanced to a third-stage evidentiary hearing. He claimed that newly discovered evidence served to exonerate him. Specifically, defendant attached a sworn affidavit from Berrum that asserted "that at no time prior to them being rear-ended by the car driven by Martin Cortez did Berrum display, attempt to use or fire his handgun that day." The petition further averred that defendant was "unaware that Berrum had a weapon with him."

¶ 13    Berrum's affidavit stated that he and defendant were "driving around Elgin smoking weed in his girlfriend's black Toyota" on March 5, 2010. While stopped at a traffic light, Berrum saw a silver Chrysler pass in front of them with the driver "glaring at us and pointing in our direction." Defendant told Berrum that he thought the Chrysler contained Martin and Reggie Cortez. Shortly thereafter, they came to another traffic light and were right beside the Chrysler. Berrum observed Jessie Orizaba in the back seat of the Chrysler. He stated that he "opened the car door to get out and see what their problem was and ask why they were glaring and pointing at us, but before I could even step out of the car they ran through the red light and sped off at a high rate of speed."

¶ 14     Berrum and defendant then continued driving before defendant received a call from his girlfriend, reminding him "that he had to pick her up from work, so he said he had to take me home because after picking up [his girlfriend] he was going to go with [her] to see her mom at the hospital." Defendant then turned onto another street where Berrum saw the Chrysler again. In order to avoid the traffic lights, defendant took the "back way" to Berrum's house but encountered the Chrysler which made a U-turn in a parking lot and sped towards defendant's car. The Chrysler rammed the Toyota from behind, pushing it into the path of oncoming cars. Berrum claimed that he feared for his and defendant's safety, so he pulled out his "all black .45 caliber semi-automatic handgun." Berrum claimed that defendant did not know that he had a gun and would not have picked him up had he known.

¶ 15     Berrum stated that he fired the first shot from the front passenger window "at the grille, hood area" of the Chrysler "in an attempt to hit the engine." The Chrysler continued to push the Toyota so Berrum "tried to shoot a few more shots at the hood of the car but the ramming and pushing of the Chrysler kept moving my arms and gun around making me shoot wildly." Defendant's car hit a tree as a result of Chrysler's aggression. Berrum found one of the shell casings which he "hid under the seat cushion behind the driver." The Chrysler sped away, hitting another car in the process.

¶ 16     Berrum told defendant that he needed to leave the scene because Berrum "had a gun and an old warrant for his arrest." Berrum gathered his belongings and ran home. After changing clothes, Berrum called his friend, Martin Zavala, who picked him up and went to Zavala's house. Berrum and Zavala were later pulled over by police and Berrum was arrested. Berrum denied his involvement in the shooting because "he didn't want to be charged with anything." But sometime shortly thereafter, Berrum was picked out of a photo line-up and charged with attempted murder.

¶ 17    Berrum claimed that the incident was unprovoked. He claimed to not know a child was in the back seat of the Chrysler. He claimed to never threaten the occupants of the Chrysler or display a gun prior to the shooting. He reiterated that defendant did not know Berrum had a gun in his possession. He claimed that defendant's attorney attempted to contact him prior to defendant's trial to testify on defendant's behalf, but Berrum's attorney advised against it because he "did not want [Berrum] to incriminate [himself] and hurt [his] defense at trial."

¶ 18    At the third-stage evidentiary hearing, Berrum was the only witness called to testify. On direct examination, he testified consistently with was averred in his affidavit. On cross-examination, Berrum testified that both he and defendant were Latin Kings gang members on March 5, 2010. Berrum acknowledged that he and defendant were both inmates at Hill Correctional Center, had been in contact while incarcerated, and were transported together to the hearing. The State attempted to question Berrum about a gang-related prison fight to impeach his credibility. In sustaining defendant's objection to the question, the trial court stated "I won't allow prison fights in for that purpose. If you want to use his prior convictions for possible impeachment purposes, I would allow you to get into that."

¶ 19    Berrum admitted that he waived his right to remain silent on March 5, 2010, after his arrest. He admitted that he did not tell police that Jessie Orizaba was in the Chrysler with Martin and Reggie Cortez. He admitted that he did not tell police that he fired the gun out of fear. The State then turned to October 17, 2010. On that date, Berrum was in Kane County Jail. The State attempted to ask Berrum about a letter relevant to the shooting discovered by officers in Berrum's belongings. Defendant objected, arguing "if this has to do with his credibility, that's one thing, but what he may have had in his possession six month or *** seven months after this occurrence is

irrelevant." The State countered that the letter "goes to his consciousness of guilt in this case." The trial court sustained defendant's objection.

¶ 20 The State then turned to Berrum's guilty plea for his role in the attempted murder case. Berrum pleaded guilty to the attempted murder of Martin Cortez in exchange for the State's agreement to dismiss the charges of attempted murder of Reggie Cortez and B.C. Berrum was sentenced to 21 years' imprisonment. When the State attempted to question Berrum regarding the factual basis for his guilty plea, the following exchange took place:

"[THE STATE]: Now, there was a factual basis for the plea that was entered into on the day you pled guilty, correct?

[DEFENSE COUNSEL]: Objection, Judge. Factual bases are frequently offered solely for the purpose of substantiating the plea, and unless my client swore to the factual basis, I would ask that that not be entered into evidence.

\*\*\*

[THE STATE]: He agreed to what the factual basis was when he entered into that plea. He agreed to what was read to the court as being what occurred on the day of the offense.

[DEFENSE COUNSEL]: For purposes of plea.

THE COURT: I agree, for purposes of the plea, so I am sustaining the objection.

[THE STATE]: Judge, while it's not part of the Petitioner's record, it was in the companion case, and we believe that it's important for you to consider what was in the companion case when assessing the credibility of this witness.

THE COURT: I don't think we can get it in through this factual basis. I am sustaining the objection."

¶ 21    In making its findings, the trial court articulated as follows:

"I am not here to make a determination of proof beyond a reasonable doubt. That's not the Court's position here at this hearing. The position is whether or not the Court believes that the evidence presented is of such a conclusive character that it will probably change the result on retrial, the probability *** as to whether or not it will change the result on retrial.

Looking at the testimony from the transcripts of the trial, hearing the evidence presented by Mr. Berrum, I do find his testimony credible, taking into account motive, bias. I find it credible. Also taking into account his demeanor during the course of the hearing, I find it credible, and so by finding his testimony credible at the stage three hearing, and finding that the evidence that's presented being non-cumulative at the stage three hearing, I do believe there is a probability that it could change the outcome of the jury's verdict, and therefore I am granting the Petitioner's petition for a new trial."

¶ 22    The State then timely filed this appeal.

¶ 23                              II. ANALYSIS

¶ 24    The State contends that the trial court erred by not allowing it to impeach Berrum's credibility with the factual basis to his guilty plea for the attempted murder of Martin Cortez and the letter discovered with his belongings in the Kane County jail. The State further contends that the trial court's ruling that granted defendant a new trial was manifestly erroneous in that Berrum's testimony was not of such a conclusive character that it would probably change the result on retrial. We will begin our analysis with the State's evidentiary contentions.

¶ 25    The rules of evidence are not abandoned during an evidentiary hearing on a postconviction petition. Whether or not evidence is admitted during any hearing is within the sound discretion of

the trial court. Such rulings are not reversed unless there is a clear showing of abuse of discretion by the trial court. *People v. Tenney,* 205 Ill. 2d 411, 436 (2002). Our supreme court has stated that "[a]buse of discretion is the most deferential standard of review—next to no review at all—and is therefore traditionally reserved for decisions made by a trial judge in overseeing his or her courtroom or in maintaining the progress of a trial." (Internal quotation marks omitted.) *In re D. T.,* 212 Ill. 2d 347, 356 (2004). In this case, an abuse of discretion would exist only if the trial court's evidentiary rulings are "arbitrary, fanciful or unreasonable" or when "no reasonable [person] would take the view adopted by the trial court." (Internal quotation marks omitted.) *People v. Donoho,* 204 Ill.2d 159, 182 (2003).

¶ 26    During a third stage post-conviction hearing, the allegations in a defendant's petition are not taken as true and it must be proven by a preponderance of the evidence that he suffered a substantial violation of his constitutional rights. *People v. Coleman*, 206 Ill. 2d 261, 277 (2002). At such a hearing, the trial court serves as the fact finder, and, therefore, it is the court's function to determine witness credibility, decide the weight to be given testimony and evidence, and resolve any evidentiary conflicts. *People v. Domagala*, 2013 IL 113688, ¶ 34. Evidence that a codefendant or accomplice has pleaded guilty or has been convicted of the same offense is inadmissible at trial for purposes of proving the guilt of a defendant. *People v. Callaway*, 185 Ill. App. 3d 136, 141 (1989). However, such evidence is admissible for impeachment purposes. *Id.*, citing *People v. Sullivan*, 72 Ill. 2d 36, 42 (1978).

¶ 27    In the present case, the trial court informed the State that it would allow evidence of Berrum's prior convictions for purposes of impeachment when sustaining defendant's objection to the introduction of certain prison fight evidence. However, only a few moments later, when the State sought to impeach Berrum's credibility with a transcript of his guilty plea proceeding, the

trial court barred its introduction. Defendant argues that *People v. Reed*, 2020 IL 124940, supports the trial court's ruling.

¶ 28    In *Reed*, our supreme court held that a trial court may accept a plea of guilty even where a defendant asserts his innocence, as long as a sufficient factual basis exists, and the court complies with Illinois Supreme Court Rule 402. *Id.* at ¶ 34. Our supreme court further stated that the factual basis to support the plea is held to a less stringent level of proof, requiring only a basis from which the court could reasonably conclude that the defendant actually committed the acts constituting the offense to which the defendant is pleading guilty. *Id*.

¶ 29    *Reed* is distinguishable from the present case. Berrum never asserted a claim of actual innocence in a post-conviction petition following his own guilty plea. Berrum never alleged that the factual basis for his guilty plea was untrue. Berrum only executed an affidavit on defendant's behalf, setting forth a different version of events that directly contradict the factual basis he agreed to when pleading guilty. As such, *Reed* is inapplicable here.

¶ 30    The factual basis offered at Berrum's May 10, 2012, guilty plea proceeding reads as follows:

> THE COURT: All right. Please listen, Mr. Berrum, to the factual basis, then I'll have some more questions for you.
>
> [THE STATE]: Judge, if the State were to proceed to trial on the amended count, we would present evidence from Martin Cortez, Reggie Cortez, lay witnesses, police officers, and State Police Crime Lab to prove beyond a reasonable doubt that on or about March 5th, 2010, the defendant Carlos Berrum committed the offense of attempt first degree murder, a Class X felony, in violation of 720 ILCS Section 5/8-4(a) as amended, in that said defendant with the intent to commit the offense of first degree murder, in violation

of 720 ILCS Section 9-l(a)(1), performed a substantial step toward the commission of that offense in that he, without lawful justification and with the intent to kill another, fired a handgun at Martin Cortez, and while committing that offense, the defendant was armed with a handgun.

Judge, the testimony would be from Martin and Reggie Cortez; that they were in a motor vehicle driven by Martin on March 5th, 2010. The evidence will show that on that date, Mr. Berrum and his co-defendant Mr. Macedo were members of the Latin King street gang.

That on that date, Martin Cortez was an ex-member of the Maniac Latin Disciples, and that his brother Reggie Cortez used to hang out with the Kings, but was on that date a member of the Maniac Latin Disciples.

They would also testify that Martin's little son, was 3 years old, in a car seat or a booster seat in the rear of the car.

The evidence would show further that Macedo was driving the car and Mr. Berrum was the passenger. They met up with the victim's car at a location in Elgin. They had a confrontation along a route in Elgin which ended up at a Blockbuster parking lot near the intersection of McLean and Wing.

That at that point there had been a threat made by one of the people in Mr. Macedo's car and the two Cortez brothers stopped their car. They would testify that they got out of the car, they approached the car where Mr. Berrum and Mr. Macedo were. They told them that there was a young child in their car and asked them not to pursue them any further. The Cortez's would then testify that they believed the defendant had left the area with Mr. Macedo, and that Mr. Martin Cortez went out of that parking lot, took a right on McLean,

came across the vehicle driven by Mr. Macedo which was stopped. That vehicle then backed up causing Mr. Martin Cortez's vehicle to hit it, at which time the shots were fired from the car that Mr. Macedo and Mr. Berrum were in.

At the time those shots were fired, the State would present evidence that Mr. Berrum was in possession of a handgun. The evidence would show both by testimony and physical evidence that 6 shots were fired directly into that car; 5 of them hit the windshield of Martin Cortez, and nobody got hit.

The evidence would further show that Martin Cortez's car was engaged with the other car, and in an attempt to get away, he pushed that car down about a block or two-block area in a sideways manner; and that when the car stopped, this defendant fled from the scene.

Mr. Martin Cortez picked out the defendant from a photo lineup that day, and two other lay witnesses would testify that they saw somebody matching the defendant's physical description run by them. One would be the man that was working in a tent on a utility. He said the guy came right at him with a bald head holding a handgun, and another witness would testify that she also saw a person running from that area that fit the defendant's description.

The evidence would further show that neither Martin nor Reggie had any weapons in their possession when this occurred; and that at the time of this shooting, it would be the State's argument that the evidence would show that the defendant and his co-defendant were acting together, and they intended to kill the people in Mr. Martin Cortez's car when the shots were fired.

I would further state that the Elgin Police and Mr. Cortez, Martin Cortez, are in

agreement with this plea in that Mr. Martin Cortez has told me that since he testified at Mr. Macedo's [trial], somebody put a police report relating in this case in his mailbox. He sees that as a form of intimidation.

Judge, I would further state that the State has fully disclosed to the defense an oral statement made by Jessie Orizaba since the conviction of Mr. Macedo, who is Mr. Berrum's co-defendant. And that since that time of that statement, that that has been the subject of a motion for new trial based on newly discovered evidence in the co-defendant's case. And that that evidence was not given in an affidavit form to the Public Defenders, and then on two occasions since that statement was given orally to the Public Defenders, Mr. Orizaba has testified under oath that the information he gave to the Public Defenders was not true and that he was lying when he was giving them that information because he wasn't in the car of Martin or Reggie Cortez on March 5th, 2010.

I would further disclose that the testimony of Martin and Reggie Cortez from the trial of Mr. Macedo directly contradicts Mr. Orizaba's oral statement in that they clearly stated that it was just the two of them and the minor child that were in the victim's car at the time of the shooting.

And I also pointed out testimony by Mr. Orizaba that he gave this statement to help out a friend. He knew that Mr. Macedo had been convicted, and that he knew that Mr. Macedo faced a long prison term, and he was hoping to help Mr. Macedo get his *** conviction overturned.

So it's my understanding that Mr. Berrum is fully aware of that information at this time, Judge; and that would be the extent of our factual basis.

THE COURT: [Defense counsel]?

[DEFENSE COUNSEL]: Judge, I will stipulate to the factual basis. I will also set out that Mr. Berrum is aware of the motion filed by Mr. Macedo after his conviction.

THE COURT: Mr. Berrum, do you agree with your attorney's stipulation?

DEFENDANT BERRUM: Yes.

THE COURT: That these are the facts that the State would be expecting to prove at trial, and you are stipulating that that's what the evidence would be and it would support a finding of guilty; is that correct?

DEFENDANT BERRUM: (Indicating)

THE COURT: Is that "yes" or "no"?

DEFENDANT BERRUM: Yes.

¶ 31    Berrum's affidavit presented a completely different version of the events that transpired on March 5, 2010, than what he agreed the evidence against him would be had he proceeded to trial. In his affidavit, Berrum claimed that he never displayed a weapon or threatening behavior. At the guilty plea proceeding, he agreed that the evidence would show that "there had been a threat made by one of the people in [defendant's] car and the two Cortez brothers stopped their car." In his affidavit, Berrum stated that Jessie Orizaba was in the back seat of the Chrysler. At the guilty plea proceeding, he agreed that the evidence would show that Orizaba "wasn't in the car of Martin or Reggie Cortez on March 5, 2010," and that Orizaba "was lying" when he gave that information to defendant's counsel. In his affidavit, Berrum claimed that the Chrysler rammed defendant's car from behind after they had made a turn. At the guilty plea proceeding, Berrum agreed that the evidence would show that Martin Cortez "came across the vehicle driven by [defendant] which was stopped," and "that vehicle then backed up causing Mr. Martin Cortez's vehicle to hit it," before Martin pushed defendant's car down the block "in an attempt to get away." In his affidavit,

Berrum claimed that defendant was unaware that Berrum had a gun and would not have picked Berrum up had he known. At the guilty plea proceeding, Berrum agreed that the evidence would show that Berrum and defendant were "acting together, and they intended to kill the people in Mr. Martin Cortez's car when the shots were fired."

¶ 32     The State was not seeking to offer the factual basis for Berrum's guilty plea in order to prove defendant's guilt, but to impeach the credibility of his affidavit and testimony. That impeachment evidence was admissible. See *Callaway*, 185 Ill. App. 3d at 141, citing *Sullivan*, 72 Ill. 2d at 42. While we acknowledge the highly deferential standard afforded to the trial court in making evidentiary rulings, taking Berrum's affidavit and testimony at face value, and disallowing the State from properly impeaching his highly suspect version of events strikes this court as arbitrary, fanciful, and unreasonable. It became even more arbitrary when the trial court had already informed the State that it would allow evidence of Berrum's prior convictions for purposes of impeachment just before disallowing such evidence. In order to conduct a proper, fair, third stage evidentiary hearing, one of the trial court's functions was to assess the credibility of the only testifying witness. When it prevented the State from impeaching Berrum's credibility with a completely contradictory version of events that he agreed to, the trial court abandoned its role as a fair arbiter of credibility determinations. In sum, the trial court abused its discretion in disallowing the State to impeach Berrum's credibility with the factual basis for his guilty plea.

¶ 33     We next examine whether the trial court abused its discretion in disallowing the State from introducing a letter seized from Berrum on October 17, 2010, while he was in the Kane County jail awaiting trial for the attempted murder of Martin Cortez. Again, the State argues that the contents of the letter were admissible for the purpose of impeaching Berrum's credibility.

¶ 34    When the State sought to introduce the letter, it answered the trial court's question of "where are we going with this?" with "there was an item found in [Berrum's] belongings that contained writings pertinent to the case that was pending." Thereafter, the State attempted to reinforce its position that the letter should be allowed in saying "it goes to his consciousness of guilt in this case." The State later presented an offer of proof regarding the letter and acknowledged that it did not possess the actual letter at the evidentiary hearing. It instead attempted to present as an offer of proof a copy of an April 9, 2012, motion *in limine* filed by the State in Berrum's attempted murder case. Within the motion, the State alleged that Berrum wrote, "in part," as follows:

"…start looking for them niggas on it cus they both have one. Reggie Cortez. They call him "Rowdy D" Holla at him and be like "you and your brother are bogus we got paperwork…especially your brother…He point out ppl and everything…let him know not to come to court or sign any statement. If he doesn't come to court they can't do shit to…but if he does show up for him to say he thinks he saw a black man do it or sumthing and to tell his brother to do the same cus that sum hoe ass shit. Tell him if they do that, we'll give them some $ for saying it wasn't me or for not showing up to court. Emphasize the fact that they phony as fuck if they come and testify. The other nigga's name is Martin Cortez. They call him "Diablo D." Don't forget their names. Reggie and Martin."

The motion further averred that the letter was sent to the Illinois State Police Crime Lab and a report was issued finding that it was written by Berrum.

¶ 35    At the time the court made its ruling, the State had only alleged that Berrum was in possession of the letter on October 17, 2010, and had potentially considered contact with Martin and Reggie Cortez through an unknown intended recipient of the letter. However, prior to the trial

court's sustainment of defendant's objection to the letter's introduction, it mistakenly believed that, because Berrum was testifying to the events of March 5, 2010, his continued association with the Latin Kings was irrelevant. Berrum's continued allegiance to the Latin Kings in 2010, and all the way up to the third-stage evidentiary hearing, was relevant to his credibility. Further, Berrum's testimony that he was the person who pulled the gun and fired shots at the victims' car was in direct contradiction with his letter where he urged the recipient to falsely identify "a black man" as the person who committed the offense. The letter was relevant to both impeach Berrum's credibility and show that he was willing to intimidate witnesses or pay them money "for saying it wasn't me or for not showing up to court." Evidence of witness tampering is probative and relevant to demonstrate intent and consciousness of guilt. *People v. Gwinn*,, 366 Ill. App. 3d 501, 517 (2006).

¶ 36    The trial court erred in sustaining defendant's objection to Berrum's letter without allowing the State to complete its offer of proof. However, the trial court's evidentiary errors discussed above are ultimately nonevents in light of the dispositive nature of its ultimate error finding that Berrum's testimony was of such conclusive character that it would probably change the result on retrial.

¶ 37    The State contends that Berrum's assertions did not absolve defendant of criminal liability and failed to dispel the reasonable inference that defendant and Berrum were engaged in a common criminal scheme. We agree.

¶ 38    To establish a claim of actual innocence, the supporting evidence must be (1) newly discovered, (2) material and not cumulative, and (3) of such conclusive character that it would probably change the result on retrial. *People v. Robinson*, 2020 IL 123849, ¶ 47. Newly discovered evidence is evidence that was discovered after trial and that the petitioner could not have

discovered earlier through the exercise of due diligence. *Coleman*, 2013 IL 113307, ¶ 96. Evidence is material if it is relevant and probative of the petitioner's innocence. *Id.* Noncumulative evidence adds to the information that the fact finder heard at trial. *Id.* Lastly, the conclusive character element refers to evidence that, when considered along with the trial evidence, would probably lead to a different result. *Id.* The conclusive character of the new evidence is the most important element of an actual innocence claim. *Robinson*, at ¶ 48.

¶ 39     Ultimately, the question is whether the evidence supporting the postconviction petition places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt. *Coleman*, at ¶ 97. The new evidence need not be entirely dispositive to be likely to alter the result on retrial. *Id.* Probability, rather than certainty, is the key in considering whether the fact finder would reach a different result after considering the prior evidence along with the new evidence. *Id.* Put another way, the defendant's request for leave of court and his supporting documentation must set forth a colorable claim of actual innocence, *i.e.,* they must raise the probability that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence. *People v. Edwards*, 2012 IL 111711, ¶ 33.

¶ 40     The State cites *Edwards* for support in its argument that the trial court's ruling was manifestly erroneous because the claims in Berrum's testimony fell short of satisfying a claim of actual innocence. In *Edwards*, the defendant was a member of the Renegade Vice Lords street gang. *Id*. at ¶ 3. He was convicted of murder under a theory of accountability. *Id*. at ¶ 5. He filed a successive post-conviction petition alleging actual innocence based on the affidavit of his codefendant and two alibi witnesses. *Id*. at ¶¶ 10, 12. His codefendant claimed that the defendant "had nothing to do with this shooting," and that the defendant was neither "a part [of nor] took

part in this crime." *Id.* at ¶ 39. The codefendant further averred that he did not share information about the murder with the defendant after it took place. *Id.*

¶ 41 Our supreme court agreed that the affidavit contained newly discovered evidence but found that the result of the defendant's trial would have been the same. *Id.* at ¶ 39. Though the codefendant averred that the defendant "had nothing to do with this shooting" and was neither "a part [of nor] took part in this crime," the codefendant did not assert that the defendant was not present when the shooting took place. *Id.* As such, the codefendant's averment in his affidavit that he was the principal offender "does little to exonerate defendant who *** was convicted of the murder under the theory of accountability." *Id.* Our supreme court ultimately held that it was more likely than not that no reasonable juror would have convicted the defendant. *Id.* at ¶ 40. The evidence was not "of such conclusive character that it would probably change the result on retrial." *Id.*

¶ 42 The standard set forth in *Edwards* has not been strengthened or diluted since its introduction. See *People v. Taliani*, 2021 IL 125891, ¶ 59. The *Edwards* standard is merely a restatement of the well-established rule that, to set forth a colorable claim of actual innocence in a postconviction petition, the petitioner must produce newly discovered evidence that, when considered along with all the evidence presented at trial, would probably lead to a different result on retrial. *Id.*

¶ 43 Returning to the present case, we find *Edwards* instructive. Like the codefendant in that case, Berrum was a fellow Latin King gang member and defendant was convicted under a theory of accountability. However, unlike the assertions espoused in *Edwards*, Berrum's assertions through his post-conviction testimony admit defendant was driving the Toyota from which Berrum fired shots at the Chrysler and its occupants. As such, Berrum's claims of defendant's actual

innocence are less compelling than those in *Edwards* and do nothing to exonerate defendant who was convicted under a theory of accountability.

¶ 44　Further, the evidence of defendant's guilt was overwhelming. As noted, being the driver of the Toyota illustrates that defendant was an active participant in the commission of the charged offenses by pursuing the Chrysler through the streets in the middle of the day, knowing that a young child was in the back seat. The evidence showed that defendant caused the cars to collide and then maneuvered the Toyota in such a way as to give Berrum a better angle to fire shots at the car and its occupants. There is no doubt that defendant was guilty under a theory of accountability for Berrum's acts. The evidence presented supports a reasonable inference that defendant and Berrum were engaged in a common criminal scheme to kill rival gang members. Nothing suggests that they were acting in self-defense. Berrum stated that he fired at the occupants of the Chrysler because they were glaring and pointing at him and defendant, not that they ever displayed a gun or threatened that they had a gun. Indeed, Berrum's claim that Jessie Orizaba was in the back seat of the Chrysler was a well-established lie based on the record presented to both this court and the trial court, which stated that it had reviewed the record before making its ruling.

¶ 45　Just as in *Edwards*, Berrum's testimony asserting that defendant was present when the shooting took place, even if he allegedly did not know Berrum had a gun, failed to assert a colorable claim of actual innocence. Berrum's affidavit and testimony do not raise the probability that it was more likely than not that no reasonable juror would have convicted defendant, especially when the letter written by Berrum while in the Kane County jail and the agreed to factual basis of his guilty plea would have impeached any credibility he had when testifying at trial.

¶ 46　Based on the foregoing, we find that the defendant did not establish a claim of actual innocence. The trial court's ruling to the contrary was manifestly erroneous.

¶ 47                                    III. CONCLUSION

¶ 48      For the foregoing reasons, the judgment of the circuit court of Kane County is reversed.

¶ 49      Reversed.